NORRIS, McLAUGHLIN & MARCUS, P.A.
Jeremy E. Deutsch
Alfred N. Metz
Christian V. Cangiano
Ami Bhatt
875 Third Avenue, 8th Floor
New York, NY 10022
Telephone: (212) 808-0700
Facsimile: (212) 808-0844

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

C.D.S. INC.,

        Plaintiff,

  -against-

**COMPLAINT**

BRADLEY ZETLER; CDS, LLC; RAPID SYSTEMS CC;
and JOHN DOES 1-5.

        Defendants,

  -and-

AMAZON WEB SERVICES, INC.; and,
RACKSPACE US, INC.

        Nominal Defendants.

-------------------------------------------------------------------X



RECEIVED
APR 29 2016
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, C.D.S. Inc., by and through its attorneys, Norris, McLaughlin & Marcus, PA, at all times relevant, alleges upon personal knowledge except where indicated, as follows:

### STATEMENT OF THE CASE AND SUMMARY OF RELIEF REQUESTED

1.    Plaintiff brings this action to vindicate its rights and save its business from the predatory actions of its former president, Bradley Zetler, who, during his presidency and in

breach of his fiduciary duties, stole access to and converted plaintiff's intellectual property (copyrights and trademarks), stole access to and converted plaintiff's confidential business information and trade secrets, and misappropriated hundreds of thousands of dollars from the company.

2.      After Zetler's termination, he has engaged in acts designed to subvert the company by wrongfully withholding and refusing to grant the new president access to the company's Amazon Web Services account – which hosts the critical software product that the company sells—and preventing the company from servicing its clients or supporting or updating the software. Zetler has also wrongfully restricted plaintiff's administration of its own email accounts and, upon information and belief, moved the data contained therein.

3.      For the above reasons and the reasons set forth below, Plaintiff is at immediate risk of losing its clients and customers due to its inability to service them and is suffering irreparable injury caused by Zetler's actions both during the term of his presidency and post-termination.

4.      Plaintiff requests injunctive relief, declaratory judgments, and monetary damages associated with the intentionally harmful acts committed by Zetler and his agents.

## PARTIES AND RELATED NON-PARTIES

5.      Plaintiff C.D.S. Inc. (hereinafter "Inc.") is a corporation formed in or about November 14, 1994 pursuant to the laws of the State of Delaware. It has its principal place of business in the City, County, and State of New York. It is engaged in the highly competitive business of providing customized software solutions and products to talent and booking agencies in the modelling, fashion, and media businesses. It provides booking solutions that permits its agency clients to book, track, and export data for, invoicing, and preparing tax and accounting

statements for all of its clients' primary business activities – furnishing talent. Non-party Jerome Marechaux, a citizen of the Republic of France, is the majority shareholder of Inc. with a 55% interest.

6.     Defendant Bradley Zetler (hereinafter "Zetler") is a citizen of the United States and maintains an address in the State of North Carolina as well as in Cape Town, SA. Zetler served as President of Inc. in New York from 2005 until his termination in or about March 4, 2016. Zetler is a 45% shareholder in Inc.

7.     Defendant CDS, LLC (hereinafter "LLC") is a limited liability company formed upon information and belief in 2003 pursuant to the laws of the State of Delaware with its principal place of business in North Carolina. LLC is, upon information and belief, wholly owned by Zetler. LLC served as, among other things, an instrumentality of Zetler's during the time of Zetler's presidency of Inc.

8.     Defendant Rapid Systems CC (hereinafter "RS") is, upon information and belief, a South African company with its principal place of business in the Republic of South Africa. Upon information and belief, RS is wholly owned by Zetler. Upon information and belief, RS does business in the United States, in New York, and in this District.

9.     Nominal Defendant Amazon Web Services, Inc. ("Amazon") is a Delaware corporation with its principal place of business in Seattle, WA and is a nominal defendant herein included for the purposes of obtaining injunctive relief only.

10.     Nominal Defendant Rackspace US, Inc. ("Rackspace") is a Delaware corporation with its principal place of business in San Antonio, TX with notice and service address for non-routine legal matters in the City of Windcrest, TX and is a nominal defendant herein included for the purposes of obtaining injunctive relief only.

11.    John Does 1-5 are persons and/or entities as to whom we do not we do not yet have sufficient information to identify or allege that they aided and abetted or conspired with Zetler in the wrongful acts herein.  Following discovery, plaintiff reserves the right to amend its complaint.

12.    Non-party Morrison Cohen, LLP (hereinafter "MoCo") is a limited liability partnership formed pursuant to the laws of the State of New York for the practice of law and which maintains its principal place of business in the City, County, and State of New York. MoCo was engaged pursuant to a general engagement letter to provide Inc. with general corporate and legal advice while, unbeknownst to Inc., also providing Zetler, LLC, and RS with legal advice adverse to Inc.'s interests.  MoCo has, despite the duties it owes to a former client, continued to assist Zetler, LLC, and RS and to take positions, upon information and belief, adverse to the interests of Inc.

13.    Non-party David Kanfer ("Kanfer") is an attorney admitted to practice law before the Courts of the State of New York and is a partner of MoCo who maintains his principal office in MoCo's offices in the City, County, and State of New York.  Kanfer represented Inc. while simultaneously and unbeknownst to Inc., representing Zetler, LLC, and RS.  Kanfer has, despite the duties he owes to Inc., continued to assist Zetler, LLC, and RS and to take positions, upon information and belief, adverse to the interests of Inc.

**JURISDICTION AND VENUE**

14.    This Court has jurisdiction over Zetler, LLC, and RS pursuant to the authority granted under 28 U.S.C. § 1331 due to the claims brought against them under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 38 U.S.C. §1367.

15. This Court has jurisdiction over Zetler, LLC, and RS pursuant to the authority granted under 28 U.S.C. § 2201, 2202 and 28 U.S.C. § 1338 and under the Copyright Act of 1976, 17 U.S.C. § 101, et seq and the Lanham Act, 15 U.S.C. § 1051 *et seq.*, in that Inc. seeks a declaratory judgment that Inc. owns the copyrights and trademarks associated with CDS Global and associated with Agencypad, as more fully set forth below and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 38 U.S.C. §1367.

16. This Court has jurisdiction over nominal defendants Amazon and Rackspace pursuant to the authority granted under 28 U.S.C. § 2201 in that Inc. seeks a declaratory judgment that Inc. owns the accounts held by these entities.

17. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000.00 exclusive of interest and costs and plaintiff is a citizen of Delaware and New York, LLC is a citizen of North Carolina and the Republic of South Africa, Zetler is a citizen of, upon information and belief, of North Carolina and the Republic of South Africa, and RS is a citizen of the Republic of South Africa.

18. This Court has long-arm jurisdiction over Zetler pursuant to N.Y. CPLR § 302 because Zetler transacts business within the State of New York and this District and has committed tortious acts within the state, and/or has committed tortious acts without the state that have caused injury to Inc. within the state and Zetler engaged in a persistent course of conduct, derived substantial revenues from services rendered, should have reasonably expected his acts to have consequences in the state, and derives substantial revenue from interstate commerce. Plaintiff's claims arise from and are related to Zetler's contacts with the State of New York.

19. This Court has long-arm jurisdiction over LLC pursuant to N.Y. CPLR § 302 because LLC transacts business within the State of New York and this District and has

committed tortious acts within the state, and/or has committed tortious acts without the state that have caused injury to Inc. within the state and LLC engaged in a persistent course of conduct, derived substantial revenues from services rendered, should have reasonably expected its acts to have consequences in the state, and derives substantial revenue from interstate commerce. Plaintiff's claims arise from and are related to LLC's contacts with the State of New York. LLC acted only through Zetler and acted in the State of New York through Zetler and Zetler, at all times, controlled its actions.

20. This Court has long-arm jurisdiction over RS pursuant to N.Y. CPLR § 302 because RS transacts business within the State of New York and this District and has committed tortious acts within the state, and/or has committed tortious acts without the state that have caused injury to Inc. within the state and RS engaged in a persistent course of conduct, derived substantial revenues from services rendered, should have reasonably expected its acts to have consequences in the state, and derives substantial revenue from interstate (and international) commerce. Plaintiff's claims arise from and are related to RS's contacts with the State of New York. RS has, among other things, acted in the State of New York through its agent, LLC.

21. Venue is proper in this jurisdiction because pursuant to 28 U.S.C. § 1391(b)(1) and (2) because there is personal jurisdiction in this District and a substantial part of the events giving rise to the claims occurred in this District.

# FACTS COMMON TO ALL COUNTS

## THE DISCLOSED FACTS

**Origins of the Business**

22.     Jerome Marechaux began providing innovative software solutions to the talent booking industry in Paris in the early 1990's. He recognized that the modeling agencies, still booking talent with pencils and note cards, were ripe for revolution through the creation of a software and computer based booking system solution. He understood that such agencies were akin to temporary employment agencies and he exploited that by creating software functions to meet these needs.

23.     Hiring programmers, he began to successfully offer solutions under the name of his wholly owned French company, C.D.S., SARL (hereinafter, "SARL"), registered pursuant to the laws of France in or about May 1994. SARL owned the software that was thereby created. Shortly after forming SARL, Marechaux formed Inc.

24.     Talent agencies were quick to adopt his booking software system which was offered under numerous different names over the years culminating in a client-server based software system called CDS6 which was offered on a subscription basis under this name in 2009. It remains in service to this date.

25.     CDS6 offered an integrated booking solution that allowed talent bookers to reserve and book talent and allowed talent agencies to track bookings, invoice clients, manage data and marketing, perform planning functions, and perform accounting and tax reporting functions through an interface with Quickbooks.

26.     SARL registered the "CDS" trademark in France on or about July 25, 1996 (INPI; registration #96635989).

27.     On or about June 30, 2005, during a dispute with a competitor in Paris, the Commercial Court of Paris ruled that SARL owned the copyright and the CDS6 software system.

28.     Together, from 2012 onwards when the CDS Global trademark and logo was registered in France as of March 12, 2012 by SARL, SARL and Inc. operated in the worldwide market under the tradename of CDS Global (hereinafter "Global").

29.     At all times relevant from 2012, Global is a trade name that belonged exclusively to SARL and SARL and Inc. (with permission) did business under the tradename of Global.

**Zetler and Global begin to work together**

30.     Up until the end of the 1990's, SARL and Inc. dominated the market for computerized booking solutions at which time Zetler and RS began to compete with SARL and Inc. through the use of Zetler's imaging system, Portfoliopad, and his rudimentary booking software.

31.     Zetler and RS entered into agreements with SARL and Inc. pursuant to which SARL and Inc. were granted the exclusive rights to distribute Portfoliopad along with its own existing products. This agreement, the Exclusive Distributorship Agreement, was entered into on or about June 1, 2001 (hereinafter, the "DA"). Portfoliopad allowed the use of photographs to be associated with the database records maintained by and under CDS6.

32.     Zetler/RS and Global then, in 2003, entered into a further agreement – the Franchise Agreement – pursuant to which RS was granted the right to use certain CDS trademarks and to market the CDS products exclusively in South Africa. Under the Franchise

Agreement, Zetler/RS acknowledged SARL "holds a secret, substantial and confidential know-how, in the design and sale of products covered by the brand" – i.e., SARL's software.

33.    The DA was also amended in 2003 to include web hosting and design and allowing for the distribution of two other minor products – Castingpad and Productionpad.

34.    Zetler and RS were paid commissions for the sale of Portfoliopad in the amount of 30% of the gross sales.

**Zetler becomes President of Inc.**

35.    In 2005, the former president of Inc. resigned and Zetler was then appointed President of Inc. by Marechaux.  Marechaux and Zetler agreed that Zetler's duties as president encompassed and would include all the normal and customary duties of a president of a business and included, but were not limited to:

   a.  Entering into contracts on behalf of and for the benefit of the company, including but not limited to contracts with Rackspace (email provider), Amazon (to provide web hosting for websites and for the online cloud based Agencypad system), Quickbooks, and the myriad of other contracts customarily entered into by businesses operating in this field;

   b.  Creating and maintaining the business records of Inc. including but not limited to copies of all contracts and agreements;

   c.  Maintaining the registration of Inc.'s website for Inc.'s benefit;

   d.  Hiring, supervising, and terminating employees, including but not limited to the software development function of Inc.;

   e.  Entering into the lease for the new office space for Inc., including signing the personal guaranty associated with such space which Zetler signed in his personal

capacity and in which he represented that his address, for notice purposes, was 39

Beards Creek Drive, Arapahoe. NC  28510;

    f.   Hiring legal counsel for Inc.;

    g.   Hiring accounting services for Inc., including but not limited to assisting such

        accounting services professionals in responding to a New York State sales tax

        audit;

    h.   Overseeing preparation of, signing, and filing the tax returns for Inc. at the local,

        state, and federal level;

    i.   Overseeing the system by which Inc. would pay invoices given to it by vendors;

    j.   Overseeing the finances, including supervising the bank accounts, of Inc.; and,

    k.   Overseeing the continued software development required for a software products

        and services company so that it could remain competitive in the marketplace.

    36.   The Rackspace and Amazon contracts listed above were and are of critical

importance to Inc.  It is where all of the company's confidential business information and trade

secrets were stored, including sensitive communications with clients and vendors, sensitive and

confidential information concerning Inc.'s clients, sensitive and confidential information

regarding Inc.'s continued product evolution and new software development, the MS SQL Server

database, and where the confidential computer software source code was stored.  Inc. kept this

information private and confidential and access to it was strictly controlled.

    37.   These trade secrets and confidential business information provided Inc. a

competitive advantage in the market place, were not widely known, and were kept as secret by

Inc.

**Zetler Operates Inc.**

38.     Zetler was granted almost total discretion in the management and operations of Inc.  Marechaux trusted him and believed, among other things, that Zetler's long term economic interests were properly tied to the success of the company by dint of granting him an immediate stock grant, as set forth below.  Zetler thus conducted the operations of Inc. in an atmosphere of complete trust and with little or no oversight.  In this, Zetler was provided support by Jerome Viollon, an employee of SARL in Paris who assisted with accounting, invoicing, collections, and other incidental back-office support.  Zetler fostered the creation of this atmosphere of trust and confidence by giving the appearance of consulting regularly with Marechaux, in the beginning of Zetler's service as President.  Eventually, Zetler simply stopped even giving the appearance of "consulting" at all with Marechaux.

39.     Zetler understood that he was being granted extraordinary discretion and he accepted the position on that basis.  He had total discretion in all important matters including resolving issues with clients and attending to fiscal and legal matters for Inc.

40.     At the time of Zetler's appointment as president in 2005, instead of receiving an annual salary to compensate him for his work, Zetler was given an immediate stock grant of 45% of the equity in Inc.  It was the intention that his compensation for his efforts would be reflected in the growth of the value of the equity interest such that, if the company was successful under his leadership, the value of his stock would grow and, upon an exit event, he would reap the benefits of his work.  Zetler did not have a written employment agreement.

41.     Zetler was, however, reimbursed his expenses in performing his duties as president of Inc.

42.     Marechaux provided services to Inc. on the same basis as Zetler did and also had his expenses reimbursed when he travelled or performed services on behalf of Inc.

43.     Shortly after becoming president, Zetler informed Marechaux that he was experiencing tax problems with respect to the distribution of commissions under the DA from Inc. to him and RS and he proposed that he would use an existing limited liability company – LLC -- for the purpose of providing him with a more favorable tax treatment.

44.     LLC was, upon information and belief, formed in 2003.  Upon information and belief, LLC was paid all the commissions due to Zetler/RS under the DA from April 2008 going forward at Zetler's request but without any written agreement.

45.     In or about August 11, 2015, Kanfer and MoCo were retained by Inc. pursuant to a written engagement letter under which MoCo was engaged to provide "general corporate advice and counsel to cDs Global . . . and certain other matters which may arise from time to time".  Upon information and belief, Kanfer provided representation to Inc. earlier than the MoCo engagement date when Kanfer was a partner at the law firm of Tannenbaum Helpern Syracuse & Hirschtritt LLP.  At all times relevant, MoCo and Kanfer were representing Inc. in connection with the operations of Inc.'s business in the United States.

46.     Inc., in January 2016, was served with a subpoena requiring it to comply with a non-party discovery demand for litigation between a booking agency client and a model who had worked with that agency.  MoCo and Kanfer represented Inc. in connection with that dispute.

**Agencypad Development and Zetler Termination**

47.     In or about late 2009 or early 2010, Inc. began to develop a new product called Agencypad.

48.     Agencypad was a cloud or web based software system that was inspired by and based upon the CDS6 client-server based product. It would operate and was offered to the clients as a bundle which included the Portfoliopad product. Zetler's commissions under Agencypad were adjusted from 30% to 15% reflecting the fact that Portfoliopad now represented a smaller part of the software package functionality.

49.     Oversight over the development of the Agencypad product was a key responsibility of Zetler as Inc.'s President. The vast majority of the actual software creation was performed by Inc.'s long-time, in-house, full-time employee developer, Alex Gugnishev.

50.     From the very beginning, it was clear that Agencypad was plagued with problems and Marechaux attributed these problems to Zetler's poor execution of his duties and responsibilities.

51.     Zetler refused to listen to feedback, suggestions, or even instructions in order to remedy the Agencypad problems and rollout. Further, he was abusive to both clients and employees. As a result, customers in Paris rejected the new product, SARL began to lose existing customers, and new competitors who previously could not find a crack in the marketplace, began to make inroads amongst SARL's European customers.

52.     As a result, the Board of Directors of Inc. dismissed Zetler, for cause, on March 4, 2016 by resolution dated that same day and appointed a new president, Ms. Diane Treat, former head of sales for Inc.

53.     As a result of Zetler's dismissal, Inc. began to learn that Zetler had not just failed to discharge his duties correctly in overseeing the development and implementation of Agencypad, he had acted in flagrant disregard of his fiduciary obligations, as more fully set forth below in the next section.

## THE RECENTLY DISCOVERED ACTS

54.     Upon Zetler's termination as president on March 4, 2016, the scheme that he had concealed to exploit Inc. for his and LLC's own benefit and to convert and misappropriate Inc.'s assets and intellectual property began to come to light. Upon information and belief, Zetler was unfaithful, in breach of his fiduciary duties, and in breach of his contractual duties, from the very commencement of his employment with Inc.

**Zetler's Bad Acts Committed While President**

55.     Unbeknownst to Inc.'s majority shareholder and/or current president, Zetler had performed the following acts while President of Inc. This list is not exhaustive and Inc.'s knowledge is limited by the fact that Zetler has converted, without authority or authorization, many of Inc.'s corporate records, including all of the administrator accessed electronically stored information contained in Inc's email accounts (including but not limited to the emails Zetler has sent or received while President of Inc.), and Inc. expects that it will discover additional and new facts during the pendency of this litigation and will amend this paragraph as and when such new information becomes available:

   a.  Zetler used Inc's bank account and financial resources to pay for software development costs associated with RS in South Africa and associated with Portfoliopad. He did so without permission and without any benefit for Inc.;

14

b. Zetler directed Inc. to pay for LLC's expenses including but not limited to the web hosting for Portfoliopad (and the significant costs associated with hosting the large image files), invoices for Adobe, and other services, all without reimbursing Inc. for this expense, believed to be in an amount of approximately $500,000.00;

c. Zetler entered into a private business arrangement with Michael Bunker regarding a new software project for a photo retouching product called, "Touch Me Up". After Zetler was explicitly refused permission by Marechaux to use Inc.'s resources or enter into the business arrangement with Bunker on behalf of Inc., Zetler, upon information and belief, entered into the arrangement through LLC and then used Inc.'s web hosting and other resources to perform this new business. This deal concluded poorly for Mr. Bunker and, upon information and belief, when it suited Zetler, he cut off Bunker's access to the Touch Me Up website on GoDaddy, moved the website and code to an account hosted on Inc.'s Rackspace account (without permission from Inc.) and cut off Bunker's access to the Touch Me Up email accounts, hosted on Inc.'s Rackspace account. He then apparently moved that account from Inc. to the LLC account. In other words, it appears that by using LLC, and stealing Inc.'s resources, Zetler has stolen the entire Touch Me Up business from Bunker.

d. Zetler also diverted a corporate opportunity belonging to Inc. by subverting a joint venture between Bunker and Inc. The purpose of the joint venture was to provide print cards to the fashion industry. Marechaux had requested that Zetler reserve the name (in Inc.'s name), "Creative File", for Inc.'s use in the future on the web and for a print book, along with the name "Agency File". The joint venture was

performing and running at a profit from September 2013 until March 2015, and was poised to begin to make much greater profits, when Zetler abruptly terminated the joint venture on the ground that, due to problems he had with Bunker in the Touch Me Up business, he could no longer work with Bunker. As, however, was recently discovered, Zetler actually took the joint venture business personally, without authorization or permission, and performed that business under a different name and/or under LLC (with one or more other, undisclosed partner(s)) while also stealing Inc.'s old reserved business name and domain – Creative File – for use with the new, diverted venture. Furthermore, it appears as if Zetler hosted some or all of this diverted venture on Inc.'s web hosting account and domain.

e.  Zetler entered into a contract with Amazon on behalf of Inc. in order to provide for Inc.'s webhosting needs for online software for the Agencypad product but illegally and secretly signed said contract, for Inc., under the name of LLC. As a result, Inc.'s account was established in the name of LLC as Inc. has no access to any of its own software products or its own computer code and cannot service its current clients, or enroll new clients, in the Agencypad product. To date, Zetler controls the entire Amazon account and Inc. doesn't even have a copy of the contract that he signed. Amazon, citing privacy issues, will not provide a copy of the contract nor will Amazon provide Inc. with any access codes, passwords, or information of any kind, despite the fact that Inc. has been charged for the services and paid for the services from Inc.'s credit card linked to Inc.'s corporate

bank accounts at Chase Bank.  Zetler has stolen Inc.'s entire business line through his wholly owned LLC.

f.  Zetler entered into a contract with Rackspace on behalf of Inc. in order to provide for Inc.'s email account needs but signed illegally and secretly said contract, for Inc., under the name of LLC and established Inc.'s email accounts under the name of LLC.  As a result, Inc. has no overarching administrator access to any of its email accounts or electronically stored information on its own email servers and has had to establish a new email service under the name "@CDS-Official", all while Zetler continues to use the CDSGlobal email domain name in his own communications, potentially causing severe confusion in the marketplace service as he falsely represents to the world that he is still an employee of Inc.  Zetler uniquely controls the entire administrator access to the Rackspace account and Rackspace won't provide Inc. with any access codes, passwords, or information of any kind, despite the fact that Inc. has been charged for the services and paid for the services from Inc.'s credit card linked to Inc.'s corporate bank accounts at Chase Bank.  Zetler has stolen Inc.'s administrator rights over its entire email system through the medium of his wholly owned LLC by fraudulently misrepresenting that LLC had the authority to enter into a contract on behalf of Inc. and bind Inc. to make payments for and on behalf of LLC.

g.  Upon information and belief, Zetler, by and through LLC, after his termination as President of Inc., has caused Inc.'s electronically stored information and data on the Amazon and Rackspace accounts to be moved to new accounts not associated

with Inc. in any way or deleted entirely. This has been done without authority or permission from Inc.

h. During the time of Zetler's service as President of Inc., he threatened Marechaux and forced him to agree that Inc. could pay LLC, and thereby himself, a "consulting fee" of $110,000.00 in March of 2014. Neither LLC nor Zetler were ever retained as a consultant to Inc. nor, upon information and belief, did LLC or Zetler ever provide consulting services to Inc.

i. Upon information and belief, during the time of Zetler's service as President of Inc., he wrongfully and falsely transferred Inc.'s business website domain registration, CDSGlobal.com, as reflected in ICANN's records, from Inc.'s name into being owned in Zetler's own name through his wholly owned and controlled company, LLC, in North Carolina. Neither LLC nor Zetler had the right to transfer the registration of the domain in their names. It belongs to and has always belonged to Inc.

j. During the time of Zetler's service as President, Zetler (and/or LLC) personally engaged MoCo and/or Kanfer to provide personal services to him, and upon information and belief, to LLC and/or RS without disclosing to Marechaux that MoCo and/or Kanfer were providing personal legal counsel to him that were, upon information and belief, adverse to Inc.'s interests all while MoCo and Kanfer were serving as attorneys to Inc.

56. These acts have caused irreparable harm to Inc.

**Zetler's Post-Termination Acts**

57.     Upon Zetler's termination, he immediately acted in order to frustrate Ms. Treat's assumption of the office of President of Inc. and to frustrate her in the performance of her duties as President. He has acted to damage the company and to steal and misappropriate Inc.'s assets. This list is not exhaustive and Inc.'s knowledge is limited by the fact that Zetler has retained, without authority or authorization, many of Inc.'s corporate records, including administrator access to all of the electronically stored information contained in Inc's email accounts (including Zetler's own Inc. email account(s)), and Inc. expects that it will discover new facts during the pendency of this litigation and will amend this paragraph as and when such new information becomes available:

   a.  Zetler has applied to register the trademark "Agencypad" with the U.S. Trademark Office by using MoCo's assistance, in the name of LLC (as agent for RS). Agencypad does not belong to Zetler nor does Zetler/LLC/RS have any rights to or in this trademark. This action appears to have been taken for the improper purpose of stealing Inc.'s intellectual property. This registration took place one day before MoCo resigned its representation of Inc.

   b.  Zetler has registered or caused RS to register copyrights in connection with the Agencypad software product. Neither Zetler, nor LLC, nor RS, have any rights to or in this software product that was created and developed by a full time employee of Inc. in New York . This action appears to have been taken for the improper purpose of stealing Inc.'s intellectual property.

   c.  Zetler has frustrated Inc's attempts to "patch" the Agencypad software to respond to customer complaints and has terminated Inc.'s Bit Bucket account.

d. Zetler has eliminated Inc.'s "live chat function" which was a primary method of communication of customer service problems from Inc.'s clients to Inc.'s customer support technicians. Further, Zetler, as administrator of the Rackspace email server, has disabled the automatic forwarding of the NYSupport email used by Inc.'s clients to request customer support for Agencypad issues.

e. Zetler has retained total administrative control over all employee passwords and Ms. Treat is unable to hire (add employees to databases) or terminate (scrub terminated employee access to databases) without Zetler acting upon her requests. Zetler, as of April 22, began to provide Ms. Treat with some limited password access but in such a restricted way that it still does not permit Inc. to fulfill its obligations to its clients. This control from "beyond the grave" is unconscionable and has been undertaken for an improper purpose.

f. Zetler has frustrated Inc.'s attempts to regain control over the Amazon and Rackspace accounts by fraudulently misrepresenting to those entities that the accounts established with those companies belong to LLC and were established for the benefit of LLC. Thus, Inc. has failed to regain control over any of its business records, electronically stored data and information, and even its own business – the Agencypad software. Inc. is also unable to access information regarding Inc.'s own clients.

g. On March 8, 2016, four days after being terminated from Inc., upon information and belief, Zetler migrated the Rackspace data from the main account into another account that Inc. has no access to. Despite demand therefor, no access to Inc. has been given.

h. On March 11, 2016, demand was transmitted to Rackspace by counsel to provide full access to the email accounts. No response has been received.

i. As of April 21, 2016, Zetler has revoked access to the following services that Inc. should have owned or controlled:

    i. Bitbucket source code management and repository tool;

    ii. Jira development tool for the management of development tasks, sprints, and customer requests;

    iii. FTP accounts enabling access to the limited area of Amazon Web Services' account cloud server where the Agencypad sandbox web application is located;

    iv. MS SQL server login to Agencypad production database and to sandbox database;

    v. AP2XLS tools that exports Agencypad data to XLS files.

j. As a result of Zetler revoking access to the above listed tools, Inc. is now prevented from:

    i. Modifying the MS SQL server data of Inc.'s clients to solve client problems such that customer support is essentially shut down;

    ii. Exporting Agencypad client data, owned by Inc.'s clients, to XLS files if the client requests its data should, for example, the client cancel its contract with Inc.;

    iii. Deploying changes to Agencypad sandbox web application in order to further testing and continued software product development or to fix any bugs in the software;

     iv.   Continuing to develop software or innovate.

    k.  Despite demand therefore, Zetler has not turned over any of the required passwords, including but not limited to the passwords for the Amazon account, the Rackspace account, the Bitbucket account, the Jira account, or the MS SQL database.

    l.  Despite demand therefore, Zetler has not turned over to Inc. any of Inc.'s social media accounts administration rights – the Facebook or Twitter, or Instagram accounts.

58.    Upon information and belief, Zetler, by and through LLC, has been preparing to steal Inc.'s business, much as he appears to have done to Mr. Bunker and by much the same method – steal control over the web services account and email accounts and then simply falsely register and take the intellectual property for his own use.

59.    MoCo resigned its engagement with Inc. on March 30, 2016 on the grounds, hithertofore undisclosed, that it was simultaneously representing Zetler in his personal activities.

60.    MoCo, on March 29, 2016 (the day before it resigned its engagement with "CDS Global"), on behalf of Zetler and LLC (who was acting as agent for RS), filed a false trademark application claiming that LLC/RS owned the trademark to "Agencypad". This action, clearly inimical to MoCo's former client's interests, was undertaken for an improper purpose to assist LLC and Zetler in stealing Inc.'s intellectual property. MoCo knew, or should have known, that no one had rights in this trademark other than Inc. or, perhaps, SARL.

61.    Upon information and belief, Zetler has undertaken this course of action in order to destroy Inc.'s business and either to (1) take Inc's business and position in the market place which he can easily do since he, through LLC, has all of Inc.'s intellectual property and trade

secrets and confidential information, including but not limited to Inc.'s customer information or, (2) force Inc. to the brink of destruction and then assume Marechaux's share ownership at the point of a figurative gun for a fraction of the cost.

62. Zetler has, by stealing Inc.'s intellectual property, by converting Inc.'s trade secrets and confidential business information, by continuing to maintain control over Inc.'s business operations, and by using Inc.'s own lawyers to help him, has caused grave and potentially irreparable damage to Inc.

## AS AND FOR A FIRST CAUSE OF ACTION

## (DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 AS AGAINST RS)

63. Plaintiff repeats and realleges all of the preceding paragraphs as if set forth herein.

64. Among its product offerings, Inc. offers and provides its customers a software system called Agencypad.

65. Agencypad is a cloud based software system that permits clients, such as modeling agencies, the ability to, among other things, book models for engagements.

66. In or about late 2009, Agencypad was developed as a work for hire, primarily by Inc.'s full-time employees, including Alex Gugnishev, Inc.'s lead software engineer.

67. Despite the fact that Agencypad was created by Inc.'s employees and developers, RS has claimed that it owns all of the copyrights in and to the Agencypad software.

68. RS has applied for and received registrations from the U.S. Copyright Office for several copyrights covering aspects of the software code for Agencypad, including TXu001987384 for Agencypad Backend Code, TXu001987358, for Agencypad Frontend, TXu001987927, which covers Agencypad Database, TXu001987318, which includes

Agencypad Stored Procedures and Database Schema, TXu001989524, for Agencypad Backend Code 2016 and TXu001989523, for Agencypad Frontend Code 2016.

69.     RS applied for and obtained these copyright registrations despite its knowledge of Inc.'s sole rights in and to the Agencypad software and, upon information and belief, RS committed fraud on the U.S. Copyright Office.

70.     RS's registrations for the Agencypad software are in contravention of the U.S. Copyright Act and of Inc.'s rights in and to the Agencypad Software.

71.     Consequently, there exists an actual and justiciable controversy between Inc. on the one hand, and Zetler and RS on the other hand, concerning whether Inc. is the legal owner of the copyright in the Agencypad Software at issue.

72.     Plaintiff requests a declaration from this Court declaring that RS's copyright registrations for Agencypad are void, that RS's copyright registrations for Agencypad be cancelled, and that Plaintiff be recognized as the sole owner of the copyrights in and to the software code for Agencypad.

## AS AND FOR A SECOND CAUSE OF ACTION

## (DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 AS AGAINST LLC)

73.     Plaintiff repeats and realleges all of the preceding paragraphs as if set forth herein.

74.     Since, in or about August 2012, Inc. has advertised, marketed, sold, and offered for sale its cloud based software system to subscribers under the Agencypad mark in the United States.

75.     Inc. sells its Agencypad product to customers located throughout the United States.

76. Inc. owns the following U.S. Trademark Application for the Agencypad designation, Serial No. 87/018,111.

77. In the past three and a half years, Inc. has realized not less than $1,700,000.00 in sales for the goods and services offered under the Agencypad mark in the United States.

78. Additionally, Inc. has spent significant sums of money to promote, advertise and market its Agencypad brand in the United States, including through its website, available at <http://www.cdsglobal.com>.

79. As a result of Inc.'s sales of goods and services under the Agencypad designation, its extensive promotion of the Agencypad mark, and its nationwide presence, the Agencypad mark has become imbued with goodwill and renown, which is exclusively associated with Inc.

80. Despite Inc.'s sole rights in and to the Agencypad trademark, LLC has claimed ownership rights in the Agencypad mark.

81. Despite its knowledge of Inc.'s rights in the Agencypad mark, LLC filed an application to register the Agencypad trademark with the U.S. Trademark Office.

82. The Agencypad trademark application, Serial No.86/956,066, was filed on the basis of LLC's representation that LLC, either in its own capacity or as an agent of RS, is the owner of the Agencypad trademark, and that to the best of its knowledge and belief no other entity had the right to use the marks in commerce.

83. Such representation was made with knowledge of Inc.'s rights in and to the Agencypad trademark; thus, LLC knew that the representation was false and fraudulent statement made to the Trademark Office.

84. Consequently, there exists an actual and justiciable controversy between Inc. on the one hand, and Zetler and LLC on the other hand, concerning whether Inc. is the legal owner of the Agencypad trademark at issue.

85. Plaintiff requests a declaration from this Court declaring that LLC's application to register the Agencypad trademark is void, that LLC be ordered to abandon the application to register the Agencypad trademark and that such application be cancelled, and that Plaintiff is the sole owner of the trademark rights in and to the Agencypad trademark.

## AS AND FOR A THIRD CAUSE OF ACTION

## (DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 AS AGAINST ZETLER AND CONCERNING AMAZON)

86. Plaintiff repeats and realleges all of the preceding paragraphs as if set forth herein.

87. In the course of conducting his duties as President of Inc., Zetler entered into a contract with Amazon for certain services, including but not limited to web hosting services and cloud data hosting service.

88. Inc. stores valuable data on the Amazon account, including but not limited to the source code for its software products and client data.

89. Inc. has paid through its credit cards linked to its corporate bank accounts, for all expenses and costs related to the account opened with Amazon pursuant to the agreement with Amazon. From April 2016, upon information and belief, RS has paid Amazon with a credit card issued to it or to Zetler.

90.     Unbeknownst to Inc. at the time, despite the fact that he was opening said account in his capacity as President of Inc., Zetler entered into said contract with Amazon for Inc. under the name of LLC.

91.     Zetler maintained the passwords, access codes, and/or other information necessary to access the Amazon account.

92.     Following his termination from Inc., Zetler refuses to share the passwords, access codes and/or other information necessary to access the Amazon account.

93.     Without this information, Inc. is unable to access the Amazon account, and thus cannot access its crucial and valuable data stored with Amazon.

94.     Amazon has refused to grant Inc. access to the account, citing privacy issues.

95.     Consequently, there exists an actual and justiciable controversy between Inc. on the one hand, and Zetler (and Amazon in a nominal capacity) on the other hand, concerning whether Inc. is the legal owner of the Amazon account at issue, and which was paid for by Inc.

96.     Based on the foregoing, Inc. requests a declaration from this court that it is the owner of the Amazon account and that Amazon and/or Zetler must provide Inc. with the passwords, access codes and/or other information necessary for Inc. to access its account with Amazon.

## AS AND FOR A FOURTH CAUSE OF ACTION

## (DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 AS AGAINST ZETLER AND CONCERNING RACKSPACE)

97.     Plaintiff repeats and realleges all of the preceding paragraphs as if set forth herein.

98.     In the course of conducting his duties as President of Inc., Zetler entered into a contract with Rackspace for certain services, including but not limited to email hosting services.

99.     Inc. stores valuable data on the Rackspace account, including but not limited to its email servers necessary for conducting its business.

100.    Inc. has paid, through its credit cards linked to its corporate bank accounts, for all expenses and costs related to the account opened with Rackspace pursuant to the agreement with Rackspace.  From April 2016, upon information and belief, RS has paid Rackspace with a credit card issued to it or to Zetler.

101.    Unbeknownst to Inc. at the time, despite the fact that he was opening said account in his capacity as President of Inc., Zetler entered into said contract with Rackspace for Inc. under the name of LLC.

102.    Zetler maintained the passwords, access codes, and/or other information necessary to access the Rackspace account.

103.    Following his termination from Inc., Zetler refuses to share the passwords, access codes and/or other information necessary to access the Rackspace account.

104.    Without this information, Inc. is unable to access the Rackspace  account as administrator, and thus cannot have full access to its crucial and valuable data stored with Rackspace.

105.    Rackspace has refused to grant Inc. access to the account, citing privacy issues.

106.     Consequently, there exists an actual and justiciable controversy between Inc. on the one hand, and Zetler (and Rackspace in a nominal capacity) on the other hand, concerning whether Inc. is the legal owner of the Rackspace account at issue, and which is paid for by Inc.

107.    Based on the foregoing, Inc. requests a declaration from this court that it is the owner of the Rackspace account and that Rackspace and/or Zetler must provide Inc. with the

passwords, access codes and/or other information necessary for Inc. to access its account with Rackspace.

## AS AND FOR A FIFTH CAUSE OF ACTION

## (VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT 18 U.S.C. § 1030 AS AGAINST ZETLER, LLC, AND RS)

108.    Plaintiff repeats and realleges all of the preceding paragraphs as if set forth herein.

109.    Inc.'s computerized databases, electronically stored with Amazon and Rackspace are, and at all relevant times were, used in interstate commerce and communication, and thus qualify as a "protected computer" under the CFAA.

110.    Defendant Zetler did access, and continues to access, Inc.'s computerized databases, without authority and/or in excess of his authority.

111.    Upon information and belief, Defendant Zetler improperly and without authorization accessed Inc.'s computerized databases after he was terminated as President of Inc.

112.    Upon information and belief, Zetler intentionally, knowingly, and without authorization accessed Inc.'s proprietary computerized databases to obtain Inc.'s valuable data, including its client and vendor data, its confidential computer source code for the Agencypad product, and its confidential communications, in violation of of 18 U.S.C. § 1030(b).

113.    The value of Inc.'s proprietary and confidential data that was, and continues to be, accessed by Zetler exceeds $5,000.

114.    Upon information and belief, Zetler accessed the databases with the intent of providing the information contained within to LLC and RS, and knowingly caused the transmission of Inc.'s valuable data.

115. In addition, upon information and belief, Zetler knowingly and with an intent to defraud trafficked Inc.'s passwords to its proprietary databases through the transfer of such passwords to employees of LLC and RS.

116. Zetler's actions have caused Inc. to experience an interruption of service to its customers as it cannot access or maintain its proprietary databases to maintain its valuable data, including the source code to its software system.

117. Zetler's actions caused losses and damage to Inc. in an amount to be determined at trial, but in an amount that exceeds $5,000, in violation of 18 U.S.C. § 1030(b).

## AS AND FOR AN SIXTH CAUSE OF ACTION

### (BREACH OF FIDUCIARY DUTY AGAINST ZETLER FOR INJUNCTIVE RELIEF)

118. Plaintiff repeats and realleges all of the preceding paragraphs of the Complaint as if fully set forth herein.

119. As the President of Inc. from 2005 until March 2016, as well as a shareholder with a 45% interest in Inc. from 2005 to the present, Zetler dominated the management of Inc. from at least 2005 until his termination as President in March 2016.

120. As President of Inc., Zetler was a fiduciary of Inc. and owed Inc. a duty of care, a duty of loyalty, and a duty to act in good faith.

121. Pursuant to the duty of loyalty owed by Zetler to Inc., Zetler was mandated to place the best interests of Inc. over any interest he possessed which was not shared by Inc.

122. Pursuant to the duty to act in good faith subsidiary to the duty of loyalty owed by Zetler to Inc., Zetler was mandated to not intentionally act with a purpose other than that of advancing the best interests of Inc. and to not intentionally fail to act in conscious disregard for his duties to Inc.

123.    In violation and breach of his duty to act in good faith, Zetler undertook the following acts of bad faith and disloyalty while he was President of Inc., including but not limited to:

a.    entering into a contract with Amazon on behalf of Inc., in order to provide for Inc.'s webhosting needs, which contract was paid for by Inc. but which Zetler, unbeknownst to Inc., entered into under the name of LLC in a manner such that the difference of ownership and control of Inc. and LLC would not have been readily apparent to Amazon, and such that when Zetler was terminated from his position as President of Inc., Zetler through LLC was left in sole control of Inc.'s webhosting account and Inc. has been deprived of the use of that account and any control of the webhosting services effectively leaving Zetler in the position of holding Inc.'s business hostage;

b.    entering into a contract with Rackspace on behalf of Inc. in order to provide for Inc.'s email needs, which contract was paid for by Inc. but which Zetler, unbeknownst to Inc., entered into under the name of LLC in a manner such that the difference of ownership and control of Inc. and LLC would not have been readily apparent to Rackspace, and such that when Zetler was terminated from his position as President of Inc., Zetler through LLC was left in sole control of the administration rights to Inc.'s email accounts and all of the electronic information stored on the email server and Inc. has been deprived of the full use and dominion of its email accounts and the electronic information stored on the email server effectively leaving Zetler in the position of holding Inc.'s business hostage;

c. upon information and belief, entering into contracts for the provision of web development services with third party developers on behalf of Inc. in order to provide for Inc.'s development needs, including but not limited to the provision of a Bitbucket source code management and repository tool and the provision of a Jira development tool for the management or development tasks, sprints and customer requests, which contracts were paid for by Inc. but which Zetler, unbeknownst to Inc., entered into under the name of LLC in a manner such that the difference of ownership and control of Inc. and LLC would not have been readily apparent to third party developers, and such that when Zetler was terminated from his position as President of Inc., Zetler through LLC was left in sole control of Inc.'s web development tools and Inc. has been deprived of the use of its web development tools effectively leaving Zetler in the position of holding Inc.'s business hostage;

d. upon information and belief, improperly and without authorization transferring the registration as reflected in ICANN's records for Inc.'s business website, CDSGlobal.com, from Inc. into the name of LLC, a company completely under his control, such that when Zetler was terminated from his position as President of Inc., Zetler through LLC was left in sole control of Inc.'s business website and Inc. has been deprived of the use of its ability to fully use its website and the functionality thereof effectively leaving Zetler in the position of holding Inc.'s business hostage;

e. other and further acts currently unknown to Inc. which can only come to light through discovery in this matter.

124. As a direct result of Zetler's breaches of fiduciary duty, Inc. has suffered, and will continue to suffer, irreparable injury to its ability to operate its business as to which there is no adequate remedy at law.

125. For the foregoing reasons, Inc. requests this court enjoin Zetler from continuing to with the above violations of his fiduciary duties and order him to provide Inc. with all the necessary access codes, passwords, and administrative access rights to all of Inc.'s accounts as set forth above and to permanently enjoin him from exercising any administrative rights as set forth above.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### (BREACH OF FIDUCIARY DUTY AGAINST ZETLER FOR MONETARY DAMAGES)

126. Plaintiff repeats and realleges all of the preceding paragraphs of the Complaint as if fully set forth herein.

127. As the President of Inc. from 2005 until March 2016, as well as a shareholder with a 45% interest in Inc. from 2005 to the present, Zetler dominated the management of Inc. from at least 2005 until his termination as President in March 2016.

128. As President of Inc., Zetler was a fiduciary of Inc. and owed Inc. a duty of care, a duty of loyalty, and a duty to act in good faith.

129. Pursuant to the duty of loyalty owed by Zetler to Inc., Zetler was mandated to place the best interests of Inc. over any interest he possessed which was not shared by Inc.

130. In violation and breach of his duty of loyalty to Inc., Zetler misappropriated the assets of Inc. for his own personal benefit, and entered into transactions on behalf of Inc. which were solely for his own personal benefit and which were either not to the benefit of Inc. or were to Inc.'s detriment including, but not limited to:

a. using Inc.'s bank account and financial resources to pay for software development costs associated with RS in South Africa and associated with Portfoliopad;

b. using Inc.'s bank accounts and financial resources to pay for LLC's expenses including web services for hosting Portfoliopad, LLC's invoices for Adobe and other services;

c. causing Inc. to pay LLC, his wholly owned company, in March 2014, during his tenure as President, an unjustified "consulting fee" of $110,000.00;

d. causing, in an unauthorized and improper fashion, Inc. to pay invoices to various to vendors on behalf of LLC, his wholly owned company, totaling over $500,000.00;

e. entering into a contract for the provision of competing legal services with Inc.'s then outside attorneys, MoCo and Kanfer, while he was President of Inc., and failing to disclose to Inc. that he was entering into this relationship with MoCo and Kanfer, and that, upon information and belief, this representation was adverse to the interest of Inc. and was solely meant to benefit Zetler and his wholly owned companies RS and/or LLC

f. using, in an unauthorized fashion after permission for such use was specifically denied by Inc.'s majority shareholder, Inc.'s web hosting platform and other resources to support a private venture entered into between Zetler and LLC on the one hand and Michael Bunker on the other hand, this private venture was solely to Zetler and LLC's benefit and did not benefit Inc. and indeed has, upon information and belief, potentially exposed Inc. to claims from Bunker based upon Zetler's breach of that venture agreement and related torts;

g. diverting a corporate opportunity belonging to Inc. by subverting a joint venture between Bunker and Inc. The purpose of the joint venture was to provide print cards to

the fashion industry. Marechaux had previously done this in Paris under the name, "Creative Cards". The joint venture was performing and running at a profit from September 2013 until March 2015 when Zetler abruptly terminated the joint venture on the ground that, due to problems he had with Bunker in the Touch Me Up business, he could no longer work with Bunker. At the time of termination, annual turnover in this business was approximately $80,000 and annual profit was approximately $30,000. As, however, was recently discovered, Zetler actually terminated the relationship on behalf of Inc. so that he could secretly and personally take over the joint venture business, without authorization or permission, and perform that business under a different name and/or under LLC (with one or more other, undisclosed partner(s)) while also stealing Marechaux's old business name – Creative File – for use with the new, diverted venture. Furthermore, it appears as if Zetler hosted some or all of this diverted venture on Inc.'s web hosting account. Inc. has been deprived of its share of those profits – approximately $15,000 a year at last known turnover results and has been defrauded out of the hosting costs associated with the diverted venture; and,

      h.   other and further acts currently unknown to Inc. which can only come to light through discovery in this matter.

131.    As a direct result of Zetler's breaches of fiduciary duty, Inc. has suffered damages.

132.    For the foregoing reasons, Zetler is liable to Inc. for breaches of his fiduciary duties of loyalty and good faith for damages in an amount to be proven at trial but in no event less than $1,000,000.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

## (MISAPPROPRIATION OF TRADE SECRETS UNDER NEW YORK LAW AGAINST ZETLER AND LLC FOR INJUNCTIVE RELIEF)

133.    Plaintiff repeats and realleges the preceding paragraphs of the Complaint as if fully set forth herein.

134.    Preceding Zetler's tenure as president of Inc. and carrying on through that tenure to the present, Inc. has developed: sensitive, confidential and proprietary customer and subscriber lists; sensitive and confidential communications with its clients, subscribers and vendors; sensitive, confidential and proprietary information about its clients and subscribers, and the services being provided to them; sensitive, confidential and proprietary business processes; sensitive, confidential and proprietary marketing techniques; sensitive, confidential and proprietary computer software and database; sensitive, confidential and proprietary information updating, evolving and further developing its proprietary software and database; sensitive, confidential and proprietary information regarding web-based, cloud based and mobile versions of its proprietary software and database; sensitive, confidential and proprietary source code for its computer software and its web-based, cloud-based and mobile versions of the computer software and database; and a sensitive, confidential and proprietary MSL SQL server where all of its source code was stored (the "Inc. Trade Secrets").

135.    The Inc. Trade Secrets represented information that was not known outside of Inc., was used in Inc.'s business, and which gives Inc. an opportunity to obtain an advantage over Inc.'s competitors who do not know or use that information contained in the Inc. Trade Secrets.

136.    Inc. allowed access to the Inc. Trade Secrets only to its key employees and shareholders, and only on a need-to-know basis, and otherwise took reasonable steps to protect

the Inc. Trade Secrets and to keep them confidential. Inc. protected all of the Inc. Trade Secrets password protection. Each Inc. department had segregated data and each Inc. department could only access that data to which it was privy in order to perform its duties. Zetler was the only employee with complete access to all of the Inc. Trade Secrets.

137.     The Inc. Trade Secrets represented a substantial investment to Inc. in product development costs as well as a substantial investment in the value and goodwill of Inc.'s ongoing business.

138.     The ability to properly acquire or duplicate the information contained in the Inc. Trade Secrets would be very difficult. Indeed, Inc.'s own internal software engineer has estimated that if it is even possible for Inc. alone to completely recreate and replace its database that it would take in excess of a year.

139.     Defendants used Zetler's unfettered access, as president of Inc. and a 45% shareholder in Inc., to the Inc. Trade Secrets during his tenure as president and following his departure from Inc. to misappropriate the Inc. Trade Secrets.

140.     Defendants have used the misappropriated Inc. Trade Secrets in a number of ways, *inter alia*, falsely registering, without Inc.'s knowledge, Inc.'s sensitive, confidential and proprietary source code for its computer software and its web-based, cloud-based and mobile versions of the computer software and database with the U.S. Copyright Office as its own intellectual property, and falsely attempting to register, without Inc.'s knowledge, Inc.'s other intellectual property belonging to Inc. with the United States Patent and Trademark Office, and by falsely claiming ownership of Inc.'s own website by filing an ownership claim for such website with ICANN.

141.    As a direct result of Zetler's misappropriation of the Inc. Trade Secrets and intellectual property as set forth herein, Inc. has suffered, and will continue to suffer, irreparable injury to its ability to operate its business as to which there is no adequate remedy at law.

142.    For the foregoing reasons, Inc. requests this court enjoin Defendants permanently from using the misappropriated Inc. Trade Secrets and require him to return all such Inc. Trade Secrets and intellectual property and all access thereto back to Inc.

## AS AND FOR A NINTH CAUSE OF ACTION

## (CONVERSION AGAINST ZETLER AND LLC FOR INJUNCTIVE RELIEF)

143.    Plaintiff repeats and realleges the preceding paragraphs of the Complaint as if fully set forth herein.

144.    As president of Inc., Zetler arranged to have Inc.'s online software product, Agencypad, its computer source codes, and its client databases hosted with Amazon (the "Inc.-Amazon Information").

145.    The Inc.-Amazon Information is the property of and is owned by Inc.

146.    As president of Inc., Zetler arranged to have Inc.'s email accounts and the electronically stored information associated with those emails hosted and stored through Rackspace (the "Inc.-Rackspace Information").

147.    Upon his termination as president of Inc., Inc. learned that Zetler has sole personal access to the passwords and access codes which would allow Inc. to access its information hosted and stored by Amazon and kept for himself all of the administrative passwords and access codes for Rackspace, and that Zetler had improperly and in an unauthorized manner registered Inc.'s Amazon account and Rackspace accounts in the name of LLC, despite the fact that all bills to Amazon and Rackspace were paid by Inc.

148.    Despite repeated requests from Inc.'s new president to Zetler and a demand from Inc.'s outside counsel on April 21, 2016, Zetler has refused to provide the passwords or access codes necessary for Inc. to access its information hosted and stored by Amazon and has refused to provide the passwords and access codes necessary for Inc. to exercise administrator rights and privileges over its Rackspace account.

149.    Despite a request to Amazon for access to the Amazon account so that Inc. can access the Inc.-Amazon Information, Amazon has refused to provide such access relying upon Zetler's unauthorized and inappropriate registration of the account in LLC's name.

150.    Despite a request to Rackspace for administrative access to the Rackspace accounts so that Inc. can access the Inc.-Rackspace Information as the rightful administrator and owner, Rackspace has refused to provide such access relying upon Zetler's unauthorized and inappropriate registration of the account in LLC's name.  Indeed, upon information and belief, on March 8, 2016, Zetler migrated the data from the account to yet another account which Inc. has no access.

151.    Because of Zetler's actions, Inc. has been completely excluded from access to the Inc.-Amazon Information and completely excluded from administrative access to the Inc.-Rackspace Information, and Zetler and LLC have assumed and exercised unauthorized rights of ownership over the Inc. Amazon Information and the Inc.-Rackspace Information to the improper and total exclusion of Inc.'s ownership rights therein.

152.    Upon information and belief, improperly and without authorization. Zetler has transferred the registration of Inc.'s business website, CDSGlobal.com, as reflected in ICANN's records, from Inc. into the name of LLC, a company completely under his control, such that when Zetler was terminated from his position as President of Inc., Zetler through LLC was left in

sole control of Inc.'s business website. Inc. owned this website and would have continued to own it but for Zetler's improper transfer of registration.

153.    Because of Zetler's actions, Inc. has been excluded from the use of its ability to fully use its website and the functionality thereof effectively leaving Zetler in the position of holding Inc.'s business hostage and Zetler and LLC have assumed and exercised unauthorized rights of ownership over the business website to the improper and total exclusion of Inc.'s ownership rights therein.

154.    Additionally, Zetler is in sole possession of the passwords and access codes for Inc.'s Facebook, Twitter and Instagram accounts (the "Social Media Accounts").

155.    Inc. was the sole owner of the Social Media Accounts.

156.    He has refused to provide Inc. with those passwords and administrator access codes to the Social Media Accounts.

157.    Because of Zetler's actions, Inc. has been completely excluded from administrator level access to the Social Media Accounts owned by Inc., and Zetler and LLC have assumed and exercised unauthorized rights of ownership over the Social Media Accounts to the improper and total exclusion of Inc.'s ownership rights therein.

158.    Likewise, Zetler is in sole possession of the passwords and access codes to Inc.'s Bitbucket source code management tool and account, Inc.'s Jira development tool, Inc.'s FTP accounts, Inc.'s Ms SQL server, and Inc.'s AP2XLS tools (the "Inc. Development Tools").

159.    Inc. was the sole owner of the Inc. Development Tools.

160.    Because of Zetler's actions, Inc. has been completely excluded from access to the Inc. Development Tools owned by Inc., and Zetler and LLC have assumed and exercised

unauthorized rights of ownership over the Inc. Development Tools to the improper and total exclusion of Inc.'s ownership rights therein.

161.   Further, Zetler is in sole possession of Inc.'s corporate and business records and/or the passcodes and access codes to accounts containing that information including, but not limited to, certain employee and client databases ("Corporate Records").

162.   Inc. is the sole owner of the Corporate Records.

163.   Because of Zetler's actions, Inc. has been completely excluded from access to the Corporate Records owned by Inc., and Zetler and LLC have assumed and exercised unauthorized rights of ownership over the Corporate Records to the improper and total exclusion of Inc.'s ownership rights therein.

164.   Inc.'s business has been damaged by being completely excluded from access to the above identified accounts and information as Zetler and LLC's sole exercise of ownership rights over that information has made it impossible for Inc. to, inter alia, provide patches or updates and other customer services and solutions to its clients.

165.   Inc. has been and will continue to be irreparably injured by the conversion of the property as set forth herein.

166.   For the foregoing reasons, Inc. requests this court require Defendants to permanently relinquish the passwords and/or access codes to the Inc.-Amazon Information, the Inc.-Rackspace Information, the business website, the Social Media Accounts, and the Inc. Development Tools, Corporate Records, and to permanently enjoin Defendants from using that information and those accounts.

### AS AND FOR A TENTH CAUSE OF ACTION

### (UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST
### IN THE ALTERNATIVE AGAINST DEFENDANTS ZETLER AND LLC)

167.    Plaintiff repeats and realleges the preceding paragraphs of the Complaint as if

fully set forth herein.

168.    Zetler and LLC were enriched in that they have improperly and in an

unauthorized manner has taken possession of various items of Inc.'s property, including but not

limited to the unjustified $110,000.00 in the form of an "consulting fee" which he granted to

himself during his tenure as president of Inc., and upon information and belief that $110,000.00

currently resides in LLC's accounts; and Zetler improperly enriched himself and LLC by

improperly and without authorization causing Inc., during his tenure as president, to pay invoices

to various vendors on behalf of LLC, his wholly owned company, totaling over $500,000.00.

169.    Zetler and LLC's enrichment was done at Inc.'s expense, in that Inc. has

improperly been deprived of its property and money.

170.    As set forth in detail supra, Zetler used improper means and violations of his

fiduciary duties to get Inc.'s property and money which he has distributed, upon information and

belief, to Defendant LLC, such that it is against equity and good conscience to permit Zetler and

LLC to retain that property and that money.

171.    Zetler was a fiduciary of Inc. as its president when he improperly took Inc.'s

property and cash and upon information and belief put them into Defendant LLC, of which he is

the sole owner and which has operated as his instrumentality in taking Inc.'s property and

money.

172.    There was an express or implied promise that Zetler as president would act in the

best interest of Inc., and would, *inter alia*, arrange for Inc. to be the sole signatory of the

accounts which should have borne its name; and there was an express or implied promise that Zetler would not receive a salary or consulting fee during his tenure as president of Inc. which he agreed to forgo in exchange for receiving 45% of Inc.'s stock. Zetler made transfers to himself and LLC, as described above, which actions were in violation of these promises and unjustly enriched him and LLC.

173. A constructive trust should be imposed against LLC and Zetler in regard to that property and those funds, and upon trial of this matter Inc. should be awarded a return of that property and those funds as to which Zelter and LLC have unjustly enriched themselves, the full amount of which will be determined at trial.

## AS AND FOR A ELEVENTH CAUSE OF ACTION
## (UNFAITHFUL SERVANT AS AGAINST ZETLER)

174. Plaintiff repeats and realleges all of the preceding allegations as if they were fully set forth again herein and alleges additionally as follows.

175. Zetler was the President of Inc. and received, as his compensation, 45% of the outstanding and issued shares of stock of the corporation.

176. Zetler's conduct during the time that he was President, as alleged above, constituted a breach of his duty of loyalty and good faith.

177. Zetler's conduct during the time that he was President, as alleged above, constituted a substantial violation of the terms of his employment and the fulfillment of his primary areas of responsibility and duties as President of Inc.

178. Zetler was entrusted with discretion and management, almost without oversight, of the legal and financial affairs and business of Inc.

179. Zetler's actions, as alleged above, have damaged Inc.'s reputation in the market place in general and specifically damaged its reputation and hurt its relationships with its customers, valuable corporate assets.

180. The acts of disloyalty appear to have occurred repeatedly, lasted for years, persisted boldly even when he was asked to have corrected them, and occurred in his primary areas of responsibility as President, as alleged above.

181. Zetler was granted the stock in the company in order to compensate him for the faithful performance of his duties as President because, by so performing them, he would increase the value of the company for all.

182. Instead, as alleged above, Zetler converted all of the intellectual property of the company, including Inc.'s website, for his own benefit and to the detriment of the company.

183. In furtherance of his scheme, Zetler used his wholly owned entity, LLC.

184. Zetler actively stole confidential, proprietary, and trade secret information during the time of his employment and has continued to do so even after his employment.

185. LLC assisted Zetler in stealing the trade secret information. Zetler opened up accounts, as alleged above, with Amazon and Rackspace for the benefit of Inc., causing Inc. to pay the invoices associated with those accounts, but actually put title to those accounts in the name of LLC.

186. Zetler caused himself to be paid , through LLC, a consulting fee of $110,000 that neither he nor LLC ever earned and for which no services were performed.

187. Zetler caused Inc., without authority or permission, to pay $500,000 of invoices on behalf of or for the benefit of LLC.

188. Zetler has engaged in self-dealing.

189.     Zetler's stock compensation was tied not to the performance of a specific task but rather was tied to the overall performance of his duties and responsibilities over many years.

190.     The consulting fee, paid to LLC for Zetler's sole benefit, was not tied to the performance of a specific task and no work was ever performed in connection with Zetler charging that fee.

191.     The invoices paid for and on behalf of LLC were not tied to the performance of any tasks for Inc., were unauthorized, and no work was ever performed by LLC or for the benefit of Inc. in connection with Zetler receiving the benefit of the payment of these invoices.

192.     LLC also received distributions on behalf of Zetler and/or his other wholly owned company, RS, which would never have been paid had the true state of affairs with respect with respect to his unfaithfulness been known.

193.     Had the company known of his intentions, he would never have been granted the stock.

194.     Had the company known the true state of affairs, it would never have paid either the consulting fee or the invoices.

195.     Therefore, Inc. is entitled to receive back the forfeiture of all of the stock from this unfaithful servant in addition to the consulting fees paid to LLC, the invoices paid on behalf of LLC, and the distributions paid to LLC, as set forth above as damages in an amount to be proven at trial but, in any event, in an amount not less than $600,000.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff C.D.S. Inc. respectfully requests that this Court enter judgment against Defendants as follows:

      a.      Declaring that that RS's copyright registrations for Agencypad are void, that RS's copyright registrations for Agencypad be cancelled, and that Plaintiff be recognized as the sole owner of the copyrights in and to the software code, including but not limited to the backend code, the frontend code, the database, the stored procedures, and the database schema, for Agencypad;

      b.      Ordering RS to cancel copyright registration numbers TXu001987384 for Agencypad Backend Code, TXu001987358, for Agencypad Frontend, TXu001987927, which covers Agencypad Database, TXu001987318, which includes Agencypad Stored Procedures and Database Schema, TXu001989524, for Agencypad Backend Code 2016 and TXu001989523, for Agencypad Frontend Code 2016;

      c.      Declaring that LLC's application to register the Agencypad trademark, Serial No. 86/956,066, is void, that LLC be directed to abandon said application to register the Agencypad trademark and order that said application be cancelled, and order that Plaintiff is the sole owner of the trademark rights in and to the Agencypad trademark;

      d.      Directing the U.S. Trademark Office to deny the application, Serial No. 86/956,066;

      e.      Declaring that that Plaintiff is the owner of the Amazon account and that Amazon and/or Zetler must provide Inc. with the passwords, access codes and/or other information necessary for Inc. to access its account with Amazon;

f.     Declaring that Plaintiff is the owner of the Rackspace account and that Rackspace and/or Zetler must provide Inc. with the passwords, access codes and/or other information necessary for Inc. to access its account with Rackspace;

g.     As for the Fifth Cause of Action, entering judgment and awarding damages to Inc. in an amount to be determined at trial, but in an amount that exceeds $5,000, in violation of 18 U.S.C. § 1030(b), attorney's fees, investigative costs and other incurred losses, and interest as provided for by the statute;

h.     As for the Sixth Cause of Action, issuing a permanent injunction enjoining Zetler from continuing to violate his fiduciary duties and ordering him to provide Inc. with all the necessary access codes, passwords, and administrative access rights to all of Inc.'s accounts as set forth above and permanently enjoining him from exercising any administrative rights as set forth above;

i.     As for the Seventh Cause of Action, entering judgment and awarding damages in an amount to be proven at trial but in no event less than $1,000,000, plus reasonable attorneys' fees and costs, punitive damages in an amount not less than three times the actual damage caused, and interest;

j.     As for the Eighth Cause of Action, issuing a permanent injunction enjoining Defendants permanently from using the misappropriated Inc. Trade Secrets and requiring them to return all such Inc. Trade Secrets and intellectual property and all access thereto back to Inc.;

k.     As for the Ninth Cause of Action, entering a permanent injunction requiring Defendants to permanently relinquish the passwords and/or access codes to the Inc.-Amazon Information, the Inc.-Rackspace Information, the business website, the

Social Media Accounts, and the Inc. Development Tools, Corporate Records, and permanently enjoining Defendants from using that information and those accounts;

      l.     As for the Tenth Cause of Action, ordering the establishment of a constructive trust against LLC and Zetler in regard to that property and those funds that as to which they have been unjustly enriched, and ordering the return of that property and those funds as to which Zelter and LLC have unjustly enriched themselves, the full amount of which will be determined at trial;

      m.    As for the Eleventh Cause of Action, entering judgment and awarding Plaintiff the forfeiture of all of the stock in Inc. from Zetler, in addition to the consulting fees paid to LLC, the invoices paid on behalf of LLC, and the distributions paid to LLC, as set forth above as damages in an amount to be proven at trial but, in any event, in an amount not less than $600,000.00 plus the stock certificates; and

n.     All such other and further relief as to the Court seems just, equitable, and proper under the circumstances.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demand trial by jury on all issues that are triable as of right by jury.

Dated:  April 29, 2016
        New York, NY

NORRIS MCLAUGHLIN & MARCUS, P.A.
Attorneys for Plaintiff, C.D.S. Inc.
875 Third Ave., 8th Floor
New York, NY 10022
(212) 808-0700

By: _____
        JEREMY E. DEUTSCH (JD3868)