UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
C.D.S., Inc.,                       :     16 Civ. 3199
                                    :
         Plaintiff,                 :
                                    :     FINDINGS OF FACT,
                                    :     CONCLUSIONS OF LAW,
         -v-                        :     AND FINAL JUDGMENT
                                    :
BRADLEY ZETLER, CDS LLC (n/k/a      :
MAINBOARD LLC), RAPID SYSTEMS CC    :
d/b/a MAINBOARD,                    :
                                    :
         Defendants.                :
------------------------------------x
RAPID SYSTEMS CC d/b/a MAINBOARD,   :
CDS LLC (n/k/a MAINBOARD LLC), and  :
BRADLEY ZETLER,                     :
                                    :
         Counterclaim Plaintiffs,   :
                                    :
         -v-                        :
                                    :
C.D.S., Inc.,                       :
                                    :
         Counterclaim Defendant,    :
                                    :
         -and-                      :
                                    :
DIANE TREAT, JEROME VIOLLON,        :
CHRISTELLE RIOT, CHRISTOPHE RACLE,  :
JEROME MARECHAUX, and C.D.S. SARL,  :
                                    :
         Third-Party Defendants.    :
------------------------------------x



JED S. RAKOFF, U.S.D.J.

     Although this case involves nearly a dozen parties in the
fashion technology business and conduct that occurred on at least
three continents, the underlying battle is basically between two
men: Jerome Marechaux, a French citizen residing in Paris, France,
and Bradley Zetler, a dual U.S. and South African citizen residing

1

in Cape Town, South Africa. The various other parties are either individuals employed by Marechaux or entities controlled by Marechaux or Zetler. But while their controversies reflect the international reach of modern business, they also reflects such human emotions as greed and anger that are as old as the hills.

Now locked in bitter disputes, Marechaux and Zetler were once business associates who shared funds and resources. Marechaux allowed Zetler to use his brand and cultivate his customer-base; Zetler lent Marechaux his technological know-how and business acumen. Of particular significance to the instant dispute Marechaux, in 2005, made Zetler the president of a Delaware company called C.D.S. Inc. (the "Company" or "plaintiff") that Marechaux had founded a decade earlier and that was engaged in helping fashion agencies connect with their customers electronically. Subsequently, Marechaux and Zetler developed a product called "Agencypad," a software system that combined various functions and features of Marechaux's and Zetler's existing products. Thereafter, Marechaux and Zetler sold Agencypad to modeling agencies around the world, with Marechaux taking the lead in Europe, Zetler in Africa, and both overseeing aspects of the North American operations.

But as the business grew, so did the differences between the partners. Zetler, in particular, became increasingly dissatisfied with Marechaux, and demanded more money and more control over the

global business. In 2015, Zetler threatened to break things off with Marechaux if Marechaux did not accede to his demands.

In early 2016, an uneasy stalemate collapsed. To retain the Company's head of sales, Diane Treat, Marechaux made her president of the Company, terminating Zetler from the role. In response, Zetler cut off the Company's access to various accounts and services, refused to turn over critical information belonging to the Company, and filed a series of copyright and trademark registrations in and to Agencypad – the Company's flagship product – claiming that Agencypad belonged to his South African company, Rapid Systems CC ("Rapid Systems"), pursuant to a 2001 contract. See Exclusive Distributorship Agreement ("EDA"), Pl. Ex. 1.

On April 29, 2016, the Company, seeking to recover its assets and preserve its business, brought the instant action against Zetler, as well as against Rapid Systems and CDS LLC ("the LLC"), entities wholly-owned by Zetler (collectively "defendants"). See Complaint ("Compl."), Dkt. 1. The Company argued, inter alia, that Rapid Systems' copyright and trademark registrations in and to Agencypad were void, and that the Company was the rightful owner of Agencypad. Id. The Company also sought monetary damages and injunctive relief in connection with actions Zetler took to undermine the Company during his final years as its president and in the months following his termination. Id.

On June 6, 2016, the Honorable Victor Marrero, to whom this case was assigned prior to trial, issued a preliminary injunction granting the Company co-equal access to the accounts and tools necessary for the Company to maintain and operate its business during the pendency of this litigation. See Decision and Order, Dkt. 39.

On November 8, 2016, defendants filed a second amended answer, including six affirmative counterclaims against the Company and naming six third-party defendants: Marechaux, Treat, three members of the Company's Board of Directors (Jerome Viollon, Christelle Riot, and Christophe Racle), and C.D.S. SARL ("SARL"), a French company majority-owned by Marechaux. See Defendants' Second Amended Answer, Counterclaims, and Jury Demand ("SAAC"), Dkt. 139. Zetler also brought eight derivative counterclaims against the third-party defendants on behalf of the Company.[1] Id.

---

[1] Separately, Rapid Systems sued the Company in France arguing that the Company breached the EDA by bringing the instant action claiming ownership over Agencypad in the United States. The French Courts rejected Rapid Systems' arguments, finding that ownership of Agencypad, including the Agencypad database, was not governed by the EDA. See Judgment Delivered on 12/07/2016, Commercial Court of Paris, Dkt. 386, Ex. A. Rapid Systems appealed this ruling, and the Appellate Court of Paris affirmed, agreeing that Agencypad is not a "contractual product." See Order of 1 March 2017 at 9, Appellate Court of Paris, Dkt. 386, Ex. B. The Appellate Court further found that, instead of being an outgrowth of Portfoliopad, as Rapid Systems contended, "the Agencypad software is an upgrade of CDS6 software owned by" SARL. Id. Thereafter, Rapid Systems applied to the Appellate Court for further relief, arguing that the Appellate Court had failed to adjudicate its claim that, under the terms of the EDA, Rapid Systems is the owner of certain

Following full and extensive discovery before Judge Marrero and Magistrate Judge James Cott, this action was reassigned to the undersigned on December 26, 2017 for trial. Prior to transfer, Judge Marrero, on December 21, 2017, issued a Decision and Order resolving a series of disputes between the parties regarding the effect of a parallel lawsuit in France on the scope of triable issues in this case. See Dkt. 392. On January 5, 2018, defendants moved, pursuant to Local Civil Rule 6.3, for reconsideration of the Decision and Order "insofar as it granted plaintiff's motion for collateral estoppel" and "ruled on a conflict of laws issue that had not been presented in the papers before the Court." See Dkt. 397. The Company and third-party defendants (the "Marechaux Parties") opposed. See The cDs Parties' Memorandum of Law in Opposition to Rapid Systems' Motion for Reconsideration ("Opp. Br."), Dkt. 405. On January 22, 2018, the Court denied defendants' motion from the bench. See Trial Transcript ("Tr.") 4.[2]

---

database tables, which Agencypad uses to store and access information uploaded by its clients. See Judgment of July 5, 2017, Paris Court of Appeal, Dkt. 386, Ex. C. Once again, the Appellate Court ruled against Rapid Systems, concluding that "the database operating with Agencypad, in the 'Agencypad System,' does not . . . constitute a contractual product as set forth in the distribution agreement and cannot be considered as 'relating' to the software Portfoliopad nor as an 'evolution' of the software Portfoliopad." Id. at 3.

[2] While the motion was denied without prejudice to further briefing, which briefing was timely submitted, it turns out, as discussed further below, that the Court does not ultimately need to decide either issue in order to resolve plaintiff's claims (i.e.

Thereafter, the Court held a three-week trial, during which time the Court heard testimony from approximately a dozen witnesses. On February 8, 2018, following the close of the evidence, the parties elected to dismiss the jury and submit their claims to the Court for decision. See Tr. 2128. The Court set a schedule for post-trial briefing, and the parties timely submitted their papers. See The cDs Parties' Post-Trial Brief, Dkt. 450 ("Pl. Mem."); Rapid Systems' Post-Trial Memorandum of Law ("Def. Mem."), Dkt. 451-52.

The Court now renders its findings of fact and conclusions of law, and enters final judgment.[3] Although some material facts are undisputed, the Court's determination of many material facts turns on the Court's assessment of the witnesses' credibility, including their demeanor, as well as the entirety of the trial evidence and the parties' written and oral submissions.

---

the choice of law issue or the collateral estoppel issue). Moreover, the Court finds that defendants have failed to identify grounds to reconsider Judge Marrero's decision because his Decision and Order was manifestly grounded in the French Court's opinions and the record presented by the parties. Accordingly, the Court denies defendants' motion.

[3] On February 28, at plaintiff's request, the Court issued "bottom-line" rulings (to be later detailed in the instant opinion) dismissing Count X, finding in favor of plaintiff on Counts I, II, III, and IV; finding in favor of plaintiff in part, and against plaintiff in part, on Counts VI, VII, VIII, and IX; and finding against plaintiff on Counts V and XI. The Court further found against counterclaim plaintiffs on all counts. See Order, Dkt. 453.

## I. **BACKGROUND FACTS**

Jerome Marechaux is a French citizen living in Paris. Marechaux became a professional model when he was six years old. Tr. 663:11 (Marechaux). When he was 24, Marechaux quit modeling to start a company called Force. See Tr. 664-67 (Marechaux). With Elite, his former firm, as his first client, Marechaux launched a software application called Force Booking, which offered modelling agencies a way to centrally manage bookings for their models as well as other aspects of their day-to-day business operations. See Tr. 665-67 (Marechaux).

In 1994, Marechaux changed the company's name from Force to Creation and Development of Software or C.D.S. SARL ("SARL"), Tr. 667 (Marechaux), and incorporated an entity in the U.S. called C.D.S. Inc. ("the Company"), Tr. 668 (Marechaux).[4] Although Marechaux did not formally link SARL to the Company, informally he ran the two entities as a unified global business (the "cDs Group"). SARL sold Force Booking software and its many later iterations (hereinafter the "cDs booking software") in Europe; the Company (C.D.S. Inc.) sold the software in North America.

To oversee operations in New York, Marechaux recruited a woman named Susanne Funk, and appointed her vice president of the Company. See Tr. 668 (Marechaux). Thereafter, Marechaux elevated

---

[4] On July 25, 1996, Marechaux registered the trademark for "cDs." See Tr. 675 (Marechaux); Pl. Ex. 4.

her to president, see Tr. 669 (Marechaux), and made her the
Company's majority shareholder, see id.; Pl. Ex. 32 (describing
Funk as the 60% owner of the Company's stock). During her tenure
with the Company, Funk hired several software developers to update
and further enhance the cDs booking software including, in 1998,
a Ukrainian engineer named Alex Gugnishev. Tr. 56 (Gugnishev). To
assist with sales, accounting, and development, Marechaux hired,
inter alia, Christelle Riot, Christophe Racle, and Jerome Viollon
in France. See Tr. 673-74 (Marechaux). By the end of the decade,
the cDs Group had secured most of the top modelling agencies in
New York and Paris as clients. See Tr. 1552 (Zetler) (testifying
that, by 2001, cDs had "quite a big market share").

In 2001, at the tail end of the dot-com boom, Marechaux
received a call from Bradley Zetler, a technology entrepreneur
residing in Cape Town, South Africa. See Tr. 1553 (Zetler). Zetler,
working with a software developer named Robert Nagel, see Tr.
1545:6 (Zetler), had created a product called "Portfoliopad,"
which allowed modelling agencies to upload images of their models
online and transfer them to their customers over the internet using
a website called portfoliopad.com. Portfoliopad offered agencies
a way to avoid hand delivering expensive hard copies of model
portfolios and emailing large files. See Tr. 1537-48 (Zetler).

Zetler needed a distributor for Portfoliopad with
relationships in Paris and New York to sell his service to the

major agencies. See Tr. 1552-53 (Zetler). Conversely, the cDs booking product did not yet have a digital imaging functionality, and while the Group's coders were working on one, see Tr. 685 (Marechaux), the Group's booking product, like most software at this time, stored client's data locally. Portfoliopad stood out because it stored client's data on the cloud, allowing anyone with the right credentials to access it using the internet.

Seeing an opportunity to enhance the Group's offerings to its clients, Marechaux agreed to become Portfoliopad's exclusive distributor in Europe and North America. Marechaux and Zetler memorialized their agreement in a written instrument known as the EDA, formally a contract between SARL, the Company (C.D.S. Inc.), and Rapid Systems. Under the terms of the agreement, Rapid Systems retained the right to sell Portfoliopad in South Africa and the Group agreed to pay Rapid Systems a 30% commission on sales of Portfoliopad in the rest of the world. See EDA § 14.2. (As the terms of the EDA make clear, client relationships, not software code, are the most valuable asset in the fashion technology business.)

Following the success of the EDA, Marechaux and Zetler deepened their business ties, executing an agreement on April 1, 2003 called the Franchise Contract. See Pl. Ex. 3 ("FC"). Under the Franchise Contract, SARL granted Rapid Systems the right to use the cDs brand in South Africa, see FC § 3, and Rapid Systems

began doing business as "cDs Cape Town." Additionally, Rapid Systems gained the right to sell, in exchange for a 30% commission, the Group's branded booking software in South Africa, then referred to as "M5," later referred to as "CDS6." See FC § 7. Zetler also set up an LLC in Delaware, which he called CDS LLC ("the LLC"), to capture in the United States commissions due to Rapid Systems under the EDA. See Tr. 1600 (Zetler); Tr. 1828 (Zetler).

In 2005, Funk retired, see Tr. 1028 (Funk), and Zetler, seeing an opportunity to strengthen his relationships with the Group's elite clients, boost sales of Portfoliopad in North America, and expand his role in what the parties were calling "cDs Global," offered to step in as president of the Company. As part of the deal, Zetler wanted 50% of the Company's equity. See Tr. 1644:7-8 (Zetler). Ultimately, he settled for 45%. See Tr. 1644:15-16 (Zetler) ("eventually we settled on 45/55"). Zetler's goal, which he first pitched to Marechaux around this time, see Tr. 1754:15 (Zetler), was to get Marechaux to agree to put all three companies under one roof, sell the entire business, and split the proceeds 50/50. See Tr. 1644-45 (Zetler). Marechaux never agreed to this, and his reluctance to cede additional ownership and control over the cDs business, or to sell it, eventually doomed cDs Global and his partnership with Zetler.

Thereafter, in September 2010, Marechaux and Riot, now the Chief Operating Officer of the "cDs Group," began to work with

Zetler to develop a new version of the Group's booking software, the "CDS Online Platform."[5] The then-current version, CDS6, was still a local application, meaning clients could only access their data on their own computers. Riot envisioned a program that would run on the cloud like Portfoliopad. See Email from Riot to Zetler and Marechaux dated September 13, 2010, Pl. Ex. 112 (attaching functional specifications for the "CDS Online Platform"); Tr. 751-52 (Marechaux).

Alex Gugnishev, the Company's primary software developer, spent the next two years writing the code for the new online upgrade, including nearly all of the so-called front-end and back-end code (the "application code," accounting for between 90% and 97% of the total code in the final product). See Tr. 168 (Gugnishev); Pl. Ex. 335. There was one part of the product (accounting for the remaining three to ten percent of the total code), see Tr. 168-69 (Gugnishev); 410-13 (Horowitz)), however, with which Gugnishev had meaningful help. This portion was known as the "database code" or the "data schema." Gugnishev and Zetler decided that the Company could save time and money by storing the

---

[5] Marechaux and Riot had first explored developing an online version of their booking software in 2005, but did not dedicate costly programming resources to it until 2010. See Email from Marechaux to Zetler dated November 10, 2005, Pl. Ex. 109 (instructing Zetler to contact Rob Nagel to estimate the cost of developing an online booking program). Instead, Gugnishev developed CDS6, another local version of the booking software.

data uploaded by the booking software's clients in the same database as the data uploaded by Portfoliopad's clients. See Email from Gugnishev to Zetler dated September 23, 2010, Pl. Ex. 116 (suggesting that the two applications use the same tables and fields for information used by both applications). Additionally, by using the same database for both applications, cDs Cape Town and the cDs Group could integrate their flagship products, so that clients buying both would only have to enter their information once (e.g., if a client hired a new model and entered that model's name and information in Portfoliopad, then the client could access that information while using the booking software).

Zetler directed his programmers in South Africa to work with Gugnishev to link the new booking software to the database used by Portfoliopad. That database, like a big excel spreadsheet, stored, in several dozen tables, information clients entered while using the application. For example, when creating an account, a client would enter information about their agency (such as their address and name) and information about their models (e.g. their gender, age, and hair color). See Tr. 74:4-13 (Gugnishev); Tr. 93 (Gugnishev). This database was saved online, on server space rented from third-parties (in the case of Agencypad, from Amazon Web

Services, see Def. Ex. 267), so clients could access their information again from any computer with an internet connection.[6]

Thus, information common to both applications was stored in the same tables (in "fields" like agency name, agency address, model name, model age). There were 30 of these so-called shared tables. Tr. 1929:14 (Nagel). These tables were written by Nagel for Portfoliopad. Additionally, as the booking software performed many functions that did not overlap with Portfoliopad, Gugnishev coded at least 42 new tables to save booking-related information, and Nagel coded another 21 or so. Tr. 1930 (Nagel).

As the project neared completion in June 2012, Marechaux decided to call the new software Agencypad. See Email from Marechaux to Zetler dated June 6, 2012, Def. Ex. 142. He and Zetler further agreed to market Agencypad jointly with Portfoliopad. See Email from Marechaux to Zetler and Viollon dated June 19, 2012, Def. Ex. 148. Thereafter, the Company, SARL, and Rapid Systems (doing business as cDs Cape Town) sold Agencypad bundled with Portfoliopad to their clients around the world.[7] While take-up in

---

[6] Rapid Systems' products had previously been on a Rackspace server, but Zetler migrated them to this account in 2013.

[7] Rapid Systems earned a 15% commission on sales of the total bundle, representing the Portfoliopad share of the total sales price (and equally valuing the Agencypad and Portfoliopad portions of the bundle). See Tr. 974:17-19 (Viollon) (explaining that clients signed one contract for the Agencypad/Portfoliopad bundle and that the Company paid 15% to Rapid Systems as the commission on the Portfoliopad portion).

the European market lagged, potentially because of privacy concerns, the bundle quickly became the Company's best-selling product overall. See CDS Inc. Sales by Product/Service Summary, January – December 2013, Pl. Ex. 38 (showing sales of $269,521 for Agencypad and $467,946 for the older generation CDS6 software); CDS Inc. Sales by Product/Service Summary, January – December 2015, Pl. Ex. 40 (showing sales of $728,405 for Agencypad and $380,294 for the CDS6 software).

Zetler, however, was displeased with his share of the spoils. Increasingly, he argued to his colleagues that he was the driving force behind the Group's success, and that they needed to either step up their efforts or fork over more money to him and to Rapid Systems. Although Marechaux had long ago agreed that Zetler would not have to pay commissions on his sales of the Group's products in South Africa, see Email from Marechaux to Zetler dated November 10, 2005, Pl. Ex. 109, Zetler now objected to Marechaux earning as much money as him from the cDs Global business, see Email from Zetler to Marechaux dated October 23, 2013, Pl. Ex. 133 ("In Cape Town we spoke about correcting the past on a 60/40 split, I have heard nothing from you about this again. . . I propose taking $150k from cDs NY to start to reduce the $380k and the rest we must discuss").

As Zetler supplied critical technological expertise and was an integral part of the Company, Marechaux increased Zetler's

14

compensation in 2013 and 2014, approving one-off payouts to Rapid Systems. See Part II(C)(3), infra. Nonetheless, in 2015, Zetler began to siphon off business for himself and his companies, transfer the Company's property to his LLC, and plan for the possible termination of the Franchise Contract. See Part II(B)-(C), infra. Zetler also continued to complain about his compensation. See Email from Zetler to Marechaux dated March 2, 2015, Def. Ex. 197 (accusing Marechaux of taking advantage of him, of not working enough, and of doing a poor job running SARL); id. ("I want to be compensated financially for extra time I know I put in compared to you last year); id. ("Maybe we stop the commission and you just run Paris and I take the rest").

By year-end 2015, it became clear to Marechaux and his colleagues that Zetler had diverted even more funds from the Company than they had previously known. See Tr. 1001-02 (Viollon). When Treat sought greater responsibility within the Company and Marechaux suggested to Zetler that Treat, who worked full time in New York, should be elevated to president, Zetler objected. See Email from Zetler to Marechaux dated January 21, 2016, Pl. Ex. 140. Zetler began demanding even higher commissions on sales of Rapid Systems products and claimed for the first time that Agencypad was just an outgrowth of Portfoliopad and that Rapid Systems, therefore, owned Agencypad under the terms of the EDA. See Email from Zetler to Viollon dated January 29, 2016, Def. Ex.

15

223 (stating that from "February 1 2016 we [the Company] must start paying what we should for AP commission which is same as PP 30%").

Left with little choice, Marechaux hired an attorney, appointed Racle, Viollon, and Riot as directors of the Company and, with their consent, on March 4, 2016, had the Board terminate Zetler as president of the Company. See Tr. 819-21 (Marechaux). Thereafter, the Board appointed Treat as president and informed Zetler of the change in leadership. Id. When Treat reached out to Zetler to chart a path forward, Zetler was not cooperative. See Tr. 1389 (Treat). He refused to grant the Company administrative access to the accounts where Agencypad's source code and database were housed. He also refused to turn over information that he held in his capacity as president of the Company, including the Company's tax information and employee records. See Tr. 1391-94 (Treat).

Thereafter, on April 12, 13, and 15, Zetler registered six copyrights in Agencypad: two for the front-end code; two for the back-end code; one for the database schema; and one for the database (i.e. the collection of information stored on the Amazon server). See Pl. Exs. 53-58. Unable to access its accounts or conduct its business, and facing increasing confusion in the marketplace regarding its ownership of Agencypad, on April 29, 2016, the Company brought the instant action. See Dkt. 1.

16

## II. **PLAINTIFF'S CLAIMS**

Plaintiff's eleven count complaint raises five core issues: copyright and trademark ownership (Counts I and II), conversion (Count IX), theft of trade secrets (Count VIII), computer fraud (Count V), and breach of fiduciary duty (Counts VI and VII). Plaintiff also asserts an unjust enrichment claim (Count X) and a faithless servant claim (Count XI) and seeks declaratory relief regarding online accounts at Amazon Web Services and Rackspace (Counts III and IV).

The Court assesses each claim in turn:

### A. **Counts I and II: Ownership of Agencypad**

Plaintiff seeks a declaratory judgment that the Company is the sole owner of Agencypad[8] and that, accordingly, six copyright registrations in and to Agencypad filed by Zetler on behalf of Rapid Systems are invalid.[9] See Compl. ¶¶ 63-72. According to

---

[8] For purposes of this section, Part II(A), the Court defines "Agencypad" as the front-end and back-end code copyrighted by Rapid Systems (see Footnote 9, infra) and all data, stored procedures, tables, and fields in the Portfolio database used by the Agencypad application (excluding the "shared tables" code which plaintiff does not claim to "own" and claims only to have a right to use). Additionally, although the Company sold Agencypad to its customers as a bundle with Portfoliopad, plaintiff lays no claim to Portfoliopad. Accordingly, the Court does not consider the Portfoliopad application code, or those tables in the Portfolio database used by Portfoliopad, to be part of Agencypad as just defined.

[9] These copyrights are: TXu-1-987-358 for the Agencypad Frontend Code; TXu-1-989-523 for the Agencypad Frontend Code 2016; TXu-1-987-384 for the Agencypad Backend Code; TXu-1-989-524 for the

17

plaintiff, the Company owns Agencypad because Agencypad is a work-for-hire written primarily by Alex Gugnishev, and Alex Gugnishev made his contributions to Agencypad in the course of his employment with the Company. See Pl. Mem. at 1.

As mentioned earlier, defendants initially argued that Rapid Systems owned Agencypad because Agencypad was an extension of Portfoliopad, and, under the EDA, Rapid Systems owned the rights to all "new inventions, designs or processes which evolve in the Portfoliopad Software and/or the Source Code and/or the Portfoliopad System." EDA § 15.1; Tr. 1802 (Zetler). But the French courts, which have exclusive jurisdiction over disputes arising under the EDA, found that Agencypad was not an evolution of Portfoliopad, and that, therefore, the EDA does not govern the ownership of Agencypad. See Judgment Delivered on 12/7/2016 at 8, Commercial Court of Paris, Dkt. 386, Ex. A (finding that the "Agencypad software is not a 'Contractual Product' under the [EDA]"); Judgment of July 5, 2017, Paris Court of Appeal, Dkt. 386, Ex. C (affirming the Commercial Court's decision).

Defendants now argue that Rapid Systems owns Agencypad because Alex Gugnishev worked for Rapid Systems when he made his

---

Agencypad Backend Code 2016; TXu-1-987-927 for the Portfoliopad, Castingpad, and Agencypad Database; and Txu-1-987-318 for the Portfoliopad and Agencypad Stored Procedures and Database Schema. Pl. Exs. 53-58

18

contributions to Agencypad. See Def. Mem. at 8. Alternatively, defendants argue that Agencypad is a "joint work," and, therefore, Rapid Systems owns an undivided interest in Agencypad; that Agencypad is a "collective work" and, therefore, Rapid Systems owns the parts of Agencypad written by Robert Nagel and a Rapid Systems software developer named Tiaan van Zyl; and/or that plaintiff should be equitably estopped from claiming ownership of Agencypad because plaintiff allowed Rapid Systems to sell Agencypad in certain countries without paying commissions. See Def. Mem. at 17-20.

### 1. **Whether Gugnishev Was an Employee of Rapid Systems; Whether the Company Was Agencypad's Dominant Author**

The evidence adduced at trial clearly establishes that Gugnishev was the primary author of Agencypad.[10] Gugnishev spent by far the most amount of time and effort (two to three years) of the various individuals who contributed to Agencypad. See, e.g., Tr. 1952:2-3 (Nagel) (testifying that he is not very familiar with Agencypad). Gugnishev also wrote the vast majority of the code, see Tr. 167 (Gugnishev), and oversaw the integration of the code written by Nagel, van Zyl, and Taylor Carr, an independent

---

[10] Defendants do not contest that Gugnishev is the primary author of Agencypad and that Gugnishev's employer when he wrote Agencypad is the dominant author of Agencypad. Instead, defendants argue that Gugnishev was a loaned servant working for Rapid Systems and that various components of Agencypad written by others are not suitable to a dominant author analysis.

contractor paid by the Company, see Tr. 163 (Gugnishev); Tr. 1951:5-7 (Nagel) (testifying that Gugnishev was the person tasked with creating Agencypad).[11]

If, as defendants contend, Gugnishev were a Rapid Systems employee when he did this work, then Rapid Systems would be the dominant author and sole owner of Agencypad. But there is little evidence in the record to support defendants' argument. At all times relevant, the Company, not Rapid Systems, paid Gugnishev's salary and benefits and provided Gugnishev with the instrumentalities of his work. See Tr. 57-58 (Gugnishev). Indeed, Gugnishev had never heard of Rapid Systems until 2016 when this lawsuit was filed. See Tr. 58:2-3 (Gugnishev).

Nonetheless, defendants argue that Gugnishev was a "loaned servant," nominally employed by C.D.S. Inc., but actually working for Rapid Systems pursuant to an unwritten agreement between Zetler and Marechaux. See Def. Mem. at 8; Shenker v. Baltimore & Ohio R. Co., 374 U.S. 1, 5-6 (1963) (discussing the "loaned servant" doctrine). According to defendants, the relevant question is who had "immediate control and supervision" of Gugnishev, and they argue that Zetler did, see Tr. 260:8-261:13 (Gugnishev); and that

---

[11] Most of Nagel's contributions to Agencypad were necessary in order to bundle Agencypad and Portfoliopad so they could be marketed jointly. Marechaux and Zetler thought that tying together the two products would lower the costs and improve the user experience, sparing clients from entering information twice.

Zetler exercised this control, not as president of the Company, but as managing member of Rapid Systems, see Def. Mem. at 9. In support of their argument, defendants point to Gugnishev's testimony that he thought he was working for the same organization as Nagel, see Tr. 209:15-20 (Gugnishev), and that he was unaware that Rapid Systems was a distinct legal entity from C.D.S. Inc., see Tr. 205:21-206:1 (Gugnishev). Defendants also cite Zetler's testimony that he believed Gugnishev was a common CDs resource whose services were regularly farmed out to other offices. See Tr. 1900:6-20 (Zetler).

Defendants' carefully crafted narrative is, however, incomplete, at times fanciful, and highly misleading. It is true that Zetler directed many of Gugnishev's efforts on Agencypad, but the Court finds that he did so in his capacity as president of C.D.S. Inc. not as managing member of Rapid Systems.[12] Although Zetler claims that his role as president was pro forma, see Tr. 1646:1-2 (Zetler) ("[s]omeone had to sign the documents as president, and that ended up being me"), this testimony is inconsistent with the record, see Tr. 1749 (Zetler) (testifying

---

[12] Even. Zetler cannot remember a single instance in which he communicated to Gugnishev his supposed understanding that Gugnishev, when he was writing Agencypad, was working for Zetler in Zetler's capacity as managing member of Rapid Systems. See Tr. 1752-3 (Zetler). Nor could Zetler find a single instance in his voluminous email correspondence with Marechaux memorializing his supposed understanding that he was working on Agencypad on behalf of Rapid Systems and not on behalf of the Company. Id.

21

that he had management responsibilities, hired and fired employees, and signed contracts on behalf of the Company). Zetler himself argues that the Company compensated him for his contributions to the Company by, inter alia, defraying Rapid Systems' business expenses with the Company's funds. Indicating just how important a position he actually considered president to be, Zetler refused to agree when Marechaux suggested elevating Treat to president. See Tr. 1802 (Zetler).

Additionally, the Court finds nothing in Gugnishev's highly credible testimony to support defendants' version of events. Although Gugnishev testified that he thought that he worked for the same organization as Nagel, this is likely because Gugnishev thought, incorrectly, that Nagel, who was an independent contractor, worked for the Company, C.D.S. Inc. (not because he, Gugnishev, thought that he worked for Rapid Systems). After all, Zetler was the president of the Company, and, as mentioned earlier, Gugnishev had never heard of Rapid Systems.

Moreover, the facts adduced at trial clearly establish that Gugnishev was not a loaned servant.[13] See generally, Langfitt v. Fed. Marine Terminals, Inc., 647 F.3d 1116, 1123 (11th Cir. 2011)

---

[13] Plaintiff argues that the loaned servant doctrine does not apply to copyright ownership questions, but the Court need not settle this question since the facts plainly establish that the "servant" here was not on loan.

(setting forth four considerations relevant to determining whether a person is a loaned servant). Among other things, the Company never expressly transferred control over Gugnishev to Rapid Systems. Rapid Systems was in no way responsible for paying Gugnishev and never compensated the Company for his services. See Tr. 1754:19-21 (Zetler). (During the relevant time period, in fact, large sums of money flowed from the Company to Rapid Systems.) Rapid Systems did not furnish Gugnishev with the equipment necessary for his work, and Rapid Systems did not have the right to terminate his employment on the project.

Thus, the Court finds that Gugnishev was an employee of the Company when he made his contributions to Agencypad, and that, accordingly, the Company is the dominant author of Agencypad. See 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 260 (2d Cir. 2015) (holding that where multiple individuals lay claim to a work, "the dispositive inquiry is which of the putative authors is the 'dominant author'").[14]

---

[14] Courts can consider numerous factors in a dominant author analysis, including factual indicia of ownership and authorship such as decision-making authority, billing, and written agreements with third parties. See 16 Casa Duse, 791 F.3d at 260. Here, the relative contributions of the authors, the Company and Rapid Systems, as well as the indicia of ownership and authorship, as discussed in Part I, support the Court's finding that the Company is the dominant author.

## 2. **Whether Agencypad Is Jointly Owned**

Defendants argue in the alternative that Agencypad is a "joint work." See Def. Mem. at 19.[15] The Copyright Act defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. In the Second Circuit, "[i]t is only where the dominant author intends to be sharing authorship that joint authorship will result." Childress v. Taylor, 945 F.2d 500, 508 (2d Cir. 1991) (internal quotation omitted). A "co-authorship claimant bears the burden of establishing that each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors." Thomson v. Larson, 147 F.3d 195, 200 (2d Cir. 1998) (citation omitted).

Defendants here point to no evidence that the relevant authors in this case, the Company and Rapid Systems, intended to co-author Agencypad. Even Zetler, who now advances the joint ownership argument, testified at trial that it was his understanding that

---

[15] Defendants also argue that Agencypad is jointly-owned because Rapid Systems and the Company both employed Alex Gugnishev at the time he made his contributions to Agencypad, but they cite no evidence for this argument nor explain how it is different from their argument that Gugnishev was a loaned servant. As discussed previously, Gugnishev was not a loaned servant working for Rapid Systems when he made his contributions to Agencypad. Similarly, he was not an employee of Rapid Systems when he made those contributions; he was not an employee of Rapid Systems at any time.

Rapid Systems was the sole owner of Agencypad. See Tr. 1802 (Zetler) ("I believe that was our understanding").

Moreover, the underlying economics strongly suggest that at the time Agencypad was developed, all of the relevant individuals intended the Company to be the sole author of the product. Indeed, the Company paid for almost all of the incremental costs of developing Agencypad and bore almost all of the costs of maintaining Agencypad. While Zetler directed Rapid Systems to contribute to Agencypad's code, primarily by allowing the Company to adapt certain database tables and stored procedures originally developed for Portfoliopad, Rapid Systems received enormous benefits in exchange for these minimal, practically costless contributions. For example, by fusing Agencypad's database with Portfoliopad's, Rapid Systems was able to offload the entire cost of maintaining the Portfoliopad database onto the Company. See Part II(C)(1), infra. Moreover, Rapid Systems was able to increase the likelihood that the Company's booking software customers would also buy Portfoliopad.

Additionally, "[t]hough 'billing' or 'credit' is not decisive in all cases and joint authorship can exist without any explicit discussion of this topic by the parties, consideration of the topic helpfully serves to focus the fact-finder's attention on how the parties implicitly regarded their undertaking." Childress, 945 F.2d at 508. In this case, the Company never paid commissions to

Rapid Systems on the Agencypad portion of its sales of the Agencypad/Portfoliopad bundle. See Email from Marechaux to Zetler dated February 1, 2016, Def. Ex. 223 ("[i]t is not and it has never been our agreement"). And the parties' communications reveal their implicit understanding that the Company, not Rapid Systems, was the sole author of Agencypad. Therefore, the Court finds that Agencypad is not a joint work.

### 3. **Whether Agencypad Is a Collective Work**

Defendants argue in the alternative that, even if Rapid Systems is not the sole owner of Agencypad, it does not follow that the sole owner of Agencypad is C.D.S. Inc. See Def. Mem. at 17. According to defendants, that is because, Agencypad is a "collective work" or a "compilation," see 17 § 101 (defining terms), for which a "dominant author" analysis does not apply.[16] Specifically, defendants argue, the "Agencypad source code that is stacked on top of the database subdivides into parts," including the "front-end" or "client-side" source code and the "back-end" or "server-side" source code. See Def. Mem. at 18. Additionally,

---

[16] According to defendants, the company "owns only those parts of Agencypad that are Mr. Gugnishev's contributions" and "[n]o other part of Agencypad is owned by C.D.S. Inc." Def. Mem. at 19. This conclusion, however, does not even follow from defendants' argument. Defendants' argument that the Statement and Talent modules are separate works does not imply that each piece of Agencypad code written by a different author is a separate work. Indeed, defendants' expert testified at length as to how and why Agencypad functions only as an integrated whole.

defendants argue, the back-end source code "subdivides into twelve modules," and two of these modules, "Statements" and "Talent," are fully functioning stand-alone works authored by Rob Nagel in South Africa. Id.

The Copyright Act defines a collective work as "a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." 17 U.S.C. § 101 (emphasis added). The fact that defendants registered five different copyrights in Agencypad's code has little or no bearing on whether Agencypad is a collective work, absent evidence that one or more of these five portions is separate and independent from the whole. See 16 Casa Duse, 791 F.3d at 259 (holding that "a director's contribution to an integrated 'work of authorship' such as a film is not itself a 'work of authorship' subject to its own copyright protection").

Here, defendants point to no evidence that the front-end code and the back-end code are separate and independent, or that the back-end code and the database code are separate and independent. Indeed, the testimony of defendants' expert establishes precisely the opposite. See Tr. 604 (Lobel) (testifying that Agencypad is a stacked application). Plainly, the front-end code and back-end code are not freestanding works.

Nor is the Talent Module a separate and independent work. Although Gugnishev testified that the module was "[f]ully functioning to itself" (see Tr. 225:1 (Gugnishev)), defendants take this statement out of context. The Talent module was never a freestanding application, nor could it function without the other parts of Agencypad. See Tr. 224 (Gugnishev) (testifying that the Talent Module "was pieces of code that could run standalone . . . but I cannot define it as a functioning application . . . that module is useless without other parts of Agencypad").

As regards the Statements module, although defendants point to evidence that it was a separate and independent work before being incorporated into Agencypad, the issue is moot as the Court finds that the Company, not Nagel or Rapid Systems, is the module's dominant author. See Tr. 183:16-17 (Gugnishev).

Therefore, the Court finds that Agencypad (as defined in footnote 8, supra) is an integrated work of authorship subject to a dominance analysis: its authors envisioned it as a single work, sold it as a single product, and its various components function as an interconnected whole.

### 4. Equitable Estoppel

Finally, defendants argue that the Court should estop the Company from claiming ownership of Agencypad in this suit because the Company "never claimed to own Agencypad even while Rapid Systems sold Agencypad . . . and made no payment" to the Company

for those sales. See Def. Mem. at 20. But Rapid Systems' failure to make payments to the Company for sales of Agencypad in South Africa does not establish that the Company acquiesced in Rapid Systems' claims of ownership in Agencypad. To the contrary, the Company fired Zetler as soon as Zetler started advancing those claims in early 2016.

The Company did not seek to collect commissions on Agencypad sales in South Africa for the same reason the Company did not seek to collect commissions on CDS5 and CDS6 sales in South Africa: as a concession to Zetler who was constantly seeking to increase his share of the pie. This concession dates back to 2005, when Zetler and Marechaux explicitly agreed that Zetler could sell the Group's products in South Africa without paying a commission (Rapid Systems was contractually obligated under the FC to pay a commission on SARL's products). In a writing entitled "cDs Inc - cDs Paris - cDs Cape Town financial relationship," Marechaux memorialized this agreement with Zetler. See Email from Marechaux to Zetler dated October 6, 2005, Pl. Ex. 108 (stating that "cDs Paris is not going to charge cDs 5 commission to cDs Cape Town anymore"); Tr. 1636:9-10 (Zetler) (conceding that Rapid Systems owed commissions on sales of CDS5 to SARL under the Franchise Contract); Tr. 1650 (Zetler) (testifying that Marechaux agreed to "stop charging Rapid Systems" a commission on sales of CDS5).

Unsurprisingly, this understanding regarding cDs5 extended to the next two iterations: CDS6 and Agencypad ("CDS7"). See Tr. 1699 (Zetler) (testifying that "we broke each office up into being responsible for certain geographical regions"); Tr. 1660 (Zetler) (explaining that "CDS7" was an early name for the online booking software). Moreover, Marechaux's failure to charge Rapid Systems for the Group's property was consistent with Marechaux's efforts to appease Zetler until the very end. See Email from Marechaux to Zetler dated February 2, 2016, Def. Ex. 271 (responding to Zetler's increasing demands that "[w]e have always found a balance and agreed things together," offering to "review everything [again] at some point").

Thus, Zetler's defense of equitable estoppel to plaintiff's ownership claim fails because Zetler was not infringing on the Company's copyright in Agencypad when he sold it in South Africa; he was selling it with permission. The Court also notes that it was plainly Rapid Systems' practice to charge the Group commissions on Rapid Systems products; the fact that Rapid Systems did not do so in the case of Agencypad suggests that Zetler was not "ignorant of the true facts," see Def. Mem. at 20, but aware that the Company owned Agencypad. Indeed, despite repeatedly seeking additional compensation from the Company and Marechaux between 2013 and 2015, Zetler never claimed during these years that the Company, SARL, or Marechaux owed Rapid Systems a commission on sales of Agencypad.

After receiving a sweetheart deal from Marechaux regarding Rapid Systems' sales of Agencypad and CDS6 in South Africa, Zetler cannot now assert an equitable defense of estoppel. Nor can Zetler complain that the Company terminated this oral agreement after Zetler registered copyrights in Agencypad in the name of his own company as part of a war he launched against Marechaux to the detriment of clients and employees around the world.

## 5. **Copyright and Trademark Ownership**

For the reasons stated above, (1) because Gugnishev made his contributions to Agencypad in the course of his employment with the Company and the Company was the dominant author of Agencypad; (2) because defendants have failed to establish that the Company intended to co-author Agencypad with Rapid Systems; (3) because the Talent module is not a separate and independent work and the Company authored the Statements module; and (4) because defendants have failed to establish grounds for equitable estoppel, the Court finds that the Company is the sole owner of Agencypad as defined in footnote 8, supra.[17] Accordingly, the Court finds in favor of

---

[17] As regards the shared database tables, used by both Agencypad and Portfoliopad, for the reasons set forth in Part II(A), infra, the Court finds that plaintiff has a right to use these tables regardless of whether it is the sole owner of them or not. Accordingly, the Court does not reach the question of whether Nagel's contributions to Agencypad are owned by Rapid Systems; whether Rapid Systems' copyright registrations for the database are invalid because Alex Gugnishev was their dominant author; whether Robert Nagel's contributions to the Agencypad tables and

31

plaintiff on Counts I and II and grants appropriate injunctive relief in Part IV, infra.[18]

## B. **Count IX: Conversion**

Plaintiff asserts ownership in pieces of property which it claims defendants wrongfully converted. These include: (1) Agencypad's source code and Agencypad's database hosted on Amazon servers; (2) cdsglobal.com email accounts hosted on Rackspace servers; (3) three domain names (cdsglobal.com, agencypad.com, and creativefile.com); (4) three social media accounts; (5) five software development tools; and (6) business records and accounts containing information about the Company's employees and clients. See Complaint ¶¶ 143-166; Pl. Mem. at 73-74.

Defendants argue that these claims are "duplicative" of plaintiff's fiduciary duty claims and fail for the same reasons. Def. Mem. at 36. Thus defendants make no mention in their briefs of the three social media accounts, the five software development tools, or the corporate records and accounts (none of which are part of plaintiff's fiduciary duty claims).

.

---

fields are original, copyrightable expression; or what law applies to the question of who owns Nagel's contributions to Agencypad.

[18] As plaintiff is the rightful owner of Agencypad, it follows that plaintiff is the rightful owner of the Agencypad trademark (Count II), as defendants concede. See Rapid Systems' Proposed Jury Instructions at 39, Dkt. 411 ("[y]ou should decide ownership of the trademark in accordance with your findings on ownership of the copyright for Agencypad").

In New York, the tort of conversion is the unauthorized "exercise of dominion over or interference with" a specific identifiable piece of property in defiance of the owner's rights. Petty v. Barnes, 70 A.D.3d 661, 662 (N.Y. App. Div. 2010). "A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." Colavito v. New York Organ Donor Network, Inc., 8 N.Y.3d 43, 49-50 (2006) (internal citations omitted). The two "key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." Id. (internal citations omitted).[19]

## 1. **The Amazon Information**

Plaintiff argues that Zetler and the LLC wrongfully converted information hosted on an Amazon Web Services account, to wit, Agencypad's software source code and databases containing Agencypad's client data. See Pl. Mem. at 73. As the sole and rightful owner of Agencypad, plaintiff has a possessory interest in this information. See Thyroff v. Nationwide Mut. Ins. Co., 8 N.Y.3d 283, 292-93 (2007) (finding that the tort of conversion

---

[19] Defendants also assert waiver, unclean hands, and various other affirmative defenses, all of which they failed to establish at trial and do not raise in their briefs. See SAAC at 19-20.

applies to electronic data and information). Defendants interfered with plaintiff's dominion over this property when Zetler cut off the Company's access to the Amazon servers, preventing the Company from accessing the Agencypad database and source code.[20] See Tr. 195:7 (Gugnishev) (testifying that he lost access to the Agencypad source code and database in April 2016); Tr. 518 (Lobel) (testifying that the Agencypad database is located on the Amazon server); Email from Treat to Zetler dated March 8, 2016, Pl. Ex. 148 (requesting "a log in and password for the [Amazon] account as an administrator"); Tr. 1391:1-8 (Treat) (testifying that Zetler did not give her administrator access to the Agencypad source code and database). Defendants do not address this claim in their briefs. As plaintiff has established conversion of this property by a preponderance of the evidence, the Court finds Zetler and the LLC liable on Count IX as regards this information.

## 2. **The Rackspace Account**

Plaintiff argues that Zetler and the LLC wrongfully converted information hosted on a Rackspace account, to wit, email accounts at the domain cdsglobal.com and "[o]ther electronically stored information" belonging to the Company.[21] See Pl. Mem. at 73-74.

---

[20] Here Zetler's actions are plainly attributable to the LLC because he registered the Amazon account to the LLC.

[21] This "other" information is the "electronically stored information associated with the" cdsglobal.com email accounts as specified in plaintiff's complaint. See Complaint ¶ 146.

34

It is undisputed that Zetler registered cdsglobal.com in September 2004. See Tr. 1613:1-11 (Zetler); Email from Zetler to Billing Department dated September 16, 2004, Def. Ex 24. At that time, Zetler was not yet president of the Company and Zetler registered the domain in the name of "cDs" using a Cape Town address. See id.

It is also undisputed that, at that time, Marechaux owned the trademark for "cDs," see Pl. Ex. 4; Transcript dated June 2, 2016, Preliminary Injunction Hearing ("In. Tr.") at 25-29 (Marechaux), Dkt. 52, which trademark Zetler was permitted to use only pursuant to the Franchise Contract, see FC § 2.

In 2012, Zetler changed the registrant of cdsglobal.com from "cDs" to CDS Inc. See Domain Report - CdsGlobal.com dated June 22, 2017 at 76-77, Def. Ex. 541 (showing that CDSGLOBAL.COM was registered to "cDs" in Cape Town as of September 14, 2011 and that it was registered to "CDS INC" in New York as of August 29, 2012). Zetler claims that this change was a "mistake." See Tr. 1868:17 (Zetler). But it was a mistake that persisted until Zetler and Marechaux's business partnership ran aground, and, during that time, the Company, not Rapid Systems, paid the corresponding domain fees to Expert Host.[22] Furthermore, the Company, not Rapid Systems,

---

[22] In their post-trial brief, defendants claim that "Rapid Systems alone paid for, and continues to pay for, the use of the domain name" cdsglobal.com. See Def. Mem. at 29. But defendants cite only the trial transcript at 1619:1-18 (Zetler) for this proposition,

paid Rackspace for the server that hosted these emails accounts. See Tr. 1860: 10-14 (Zetler) (testifying that "there was a reseller e-mail account, which was in the name of CDS, Inc., which CDS, Inc. was paying for"); Def. Ex. 267. Although defendants may have owned this domain name in 2004, when Zetler transferred the registration to the Company in 2012, he transferred ownership of the domain and the corresponding information as well.

Therefore, when, in 2015, Zetler transferred the domain registration to his LLC, see Tr. 1003:6-7 (Viollon); Tr. 1868:12-17 (Zetler), and, subsequently, cut off the Company's access to the cdsglobal.com email accounts, see Tr. 1394:19 (Treat) (testifying that she received nothing from Zetler when she asked for, inter alia, passcodes to the email accounts), he converted the Company's property, see Tr. 1862 (Zetler) (testifying that he removed the cdsglobal.com email accounts and information from the Company's account). Accordingly, the Court finds Zetler and the LLC liable on Count IX for converting the Company's possessory

---

and that passage of Zetler's direct testimony does not establish that Rapid Systems paid for the use of this domain name. It merely states Zetler's contention that Rapid Systems "provided" people with cdsglobal.com emails, making no mention of who paid for the service. Contrary to defendants' contention in their briefs, the Court finds that Rapid Systems did not pay for this domain name during the time the name was registered to the Company. See Tr. 998 (Viollon) (testifying that the Company paid ExpertHost for registering website domain names); Tr. 2072:19 (Lerner) (testifying that domain name registration information changes when there is a change in billing).

interest in the cdsglobal.com email accounts and related information stored on the Rackspace server.

### 3. **The Domain Names**

Plaintiff contends that Zetler and the LLC wrongfully converted three domain names: creativefile.com, agencypad.com, and cdsglobal.com. See Pl. Mem. at 74; id. at 43-45. Defendants do not address this issue in their briefing.

As regards the creativefile.com domain name, Zetler registered it to "cDs" at Marechaux's request in January 2008, listing an address in South Africa. See Domain Report – CreativeFile.com dated June 23, 2017 ("CF Report") at 51, Def. Ex. 539. On August 16, 2012, the registrant was changed to "cDs Inc." See id. at 41. The Court finds, for reasons elaborated elsewhere in this opinion, that, it is more likely than not, that the Company began to pay for the use of this domain name at that time. Thereafter, the domain was used to host a website for a joint venture between the Company and Michael Bunker. See Tr. 803-13 (Marechaux).[23]

Zetler terminated this venture in March 2015, believing that the company should no longer do business with Bunker. Tr. 809:18-

---

[23] It was Marechaux who originally had the idea for this venture and for use of this name and had connected Bunker with the Company. See Email from Marechaux to Zetler dated November 10, 2005, Pl. Ex. 109 (indicating that Zetler would receive the specifications for "Creative File" from Viollon and Riot).

20 (Marechaux). Thereafter, sometime between April 14, 2015 and July 15, 2015, Zetler changed the registrant from "cDs Inc." to "CDS LLC." See CF Report at 21, 23.[24] Between April and July, Zetler also reconstituted the venture with a new partner, Steve Ullman.

Zetler argues that the "cDs" in the original registration referred to Rapid Systems (d/b/a cDs Capetown), that it was a mistake that the domain was registered to the Company beginning in 2012, and that he was only correcting that mistake when he transferred the registration to the LLC in 2015. This argument is not credible. See Def. Mem. at 30-31.

The strongest supporting evidence for Zetler's contention is that the domains for various Rapid Systems products were also transferred to the Company at around the same time and that even, at one point, Lizzie Hayat, an employee of SARL, was listed as the registrant for certain Rapid Systems products like Castingpad.com. See Domain Report – CastingPad.com dated June 22, 2017 at 37, Def. Ex. 545. But it is more likely than not that these "mistakes" were the result of Zetler's efforts to offload onto the Company the costs of paying for Rapid Systems' domains. See Tr. 2072 (Lerner)

---

[24] Defendants argue that "[t]he evidence submitted in this case provide no proof whatsoever that Zetler in anyway [sic] or at anytime 'took' any domain name away from" the Company. Def Mem. at 31. But this is not true. The circumstantial evidence plainly establishes that it is more likely than not that these domain names belonged to the Company, that they were at one point registered to the Company, and that Zetler was the one who changed their registrations to his LLC.

(testifying that registrations change when there is a change in billing).

Regardless of who the registrant was prior to 2012, during the time that the domain was used for the joint venture it was registered to the Company and paid for by the Company. Therefore, the Company, which indisputably owned the Creative File business via a contract between the Company and Michael Bunker, owned the creativefile.com domain name. See Tr. 809:13-15 (Marechaux). When Zetler changed the registration of that domain to his LLC in 2015, he improperly interfered with plaintiff's property. Therefore, the Court finds Zetler and the LLC liable on Count IX for converting the domain name creativefile.com.

Turning to "agencypad.com," Zetler registered this domain on July 18, 2011. See Domain Report – AgencyPad.com dated June 22, 2017, Def. Ex. 547. Regardless of any belief Zetler may or may not have had that he was registering this domain in his capacity as managing member of Rapid Systems, he points to no supporting evidence. As the Company owned Agencypad, the Court finds that the Company had a possessory interest in this domain name, which Zetler should have registered in the Company's name in 2011.

As of September 23, 2012, the domain was registered in the name of the Company, see id. at 48. Thus, Zetler interfered with the Company's possessory interest in this domain when he transferred the registration to his LLC in 2015. See id. at 23.

39

Accordingly, the Court finds Zetler and the LLC liable on Count IX for converting the domain name agencypad.com.

Turning, finally, to the cdsglobal.com domain, the Court, as mentioned earlier, finds that the Company is the rightful owner of this domain. Accordingly, when Zetler transferred the registration of the domain to his LLC in 2015 without telling anyone else at the Company, see Tr. 2064 (Lerner) (testifying that the domain was transferred to the LLC), he interfered with the Company's possessory interest in this property. The Court therefore finds Zetler and the LLC liable on Count IX for converting the cdsglobal.com domain name.[25]

### 4. The Social Media Accounts

Plaintiff contends that Zetler converted passwords and access codes for the Company's social media accounts on Facebook, Twitter, and Instagram. See Pl. Mem. at 74. Zetler does not address these accounts in his post-trial briefing.

Here, the social media accounts were "cDs"-branded accounts. See Tr. 1378-9 (Treat). During his time as president of the

---

[25] Plaintiff also argues that defendants wrongfully converted the company's possessory interest in "the CDSGLOBAL.com website." See Pl. Mem. at 74; Complaint ¶¶ 152-53. In so far as plaintiff seeks the source code for this website, plaintiff's claim is moot as Zetler voluntarily turned over the code in 2016. Tr. 1472 (Treat). In so far as plaintiff seeks return of the cdsglobal.com domain so that it can host its website on that domain, the claim is duplicative of plaintiff's claim regarding the cdsglobal.com domain name.

40

Company, Zetler controlled access to these accounts. Id. As Zetler had no right to use the "cDs" brand in his personal capacity, his creation of these accounts and subsequent management of them must have been either a function of his role as managing member of Rapid Systems or his role as president of the Company. See In. Tr. 25-27 (Marechaux) (testifying that he owned the CDS Global trademark).

Rapid Systems was permitted to use the "cDs" brand pursuant to the terms of the Franchise Contract. This agreement clearly specifies that the brand belongs to CDS SARL, FC § 1, and it confers upon Rapid Systems the exclusive right to use the brand only in South Africa. See id. § 3, 6. Rapid Systems has no right to use the brand outside of South Africa. Additionally, the marketing efforts for Agencypad were run by the Company using the social media accounts. See In. Tr. 42:14-15 (Marechaux). Therefore, the Court finds that Zetler set up these accounts and controlled them in his capacity as president of the Company.

Accordingly, the Court finds that the Company had a possessory interest in these accounts, which interest Zetler interfered with when he failed to turn over passwords and administrator access codes after he was terminated as president of the Company. See Complaint ¶ 156; Email from Treat to Zetler dated March 8, 2016, Pl. Ex. 148 (requesting "all information regarding [] cDs Inc., which you as the previous president handled"); Tr. 1394:19 (Treat) (testifying that she received "nothing" from Zetler in response to

41

her Email dated March 8, 2016). Thus, the Court finds Zetler and the LLC liable on Count IX for converting the three social media accounts.

### 5. **The Development Tools**

Plaintiff contends that Zetler converted passwords and access codes to five software development tools used by the Company. See Pl. Mem. at 74. These tools are a Bitbucket source code management tool and account, a Jira development tool, an FTP account, a Microsoft SQL server, and an AP2XLS tool. Id. Plaintiff provides little argument on this point in its brief and defendants do not mention the issue at all.

It is apparent from earlier proceedings in this case that Bitbucket is a service to store and manage source code. See, e.g., Proposed Recommendation of Special Master Daniel Garrie, Dkt. 59. Jira is a service to track "bugs" in software and to manage edits to the software. Microsoft SQL is a software license that one can buy and use to operate a database server. The Amazon account houses a Microsoft SQL database server, which is used by Agencypad. An FTP account allows one to transfer files back and forth from various computers. AP2XLS tools are used to convert data from the Agencypad database into excel spreadsheets, which can be sent to clients or other individuals.

As part of the preliminary injunction, these tools were duplicated so that the Company could continue to access and operate

Agencypad. Id. Some of these tools house data regarding Agencypad, which information belongs to the Company either in its own right or on behalf of its clients. Accordingly, Zetler had no right to prevent the Company from using the Bitbucket account in so far as it included Agencypad source code and related information that he chose to house on that account during his time as president of the Company. Similarly, Zetler had no right to cut off the Company's access to Agencypad source code on the Jira development tool, the Microsoft SQL server running on the Amazon account, FTP accounts used to access Agencypad data on the Amazon account, or the AP2XLS tools used to download data from the Agencypad tables and fields. As Zetler cut off the Company's access to these tools, see Tr. 1398:13-16 (Treat), the Court finds Zetler and the LLC liable on Count IX for converting the Company's possessory interest in the use of these tools to access Agencypad, its source code, and its client information.

## 6. **The Business Records**

Finally, plaintiff contends that Zetler wrongfully converted the Company's business records and access codes for accounts containing certain information belonging to the Company and its clients. See Complaint ¶¶ 161-63; Pl. Mem. at 74. These records and codes include login details for the Company's tax accounts with the New York State Department of Finance, see Tr. 1392:2-4 (Treat); login details for the Company's tax account with the

43

Internal Revenue Service, see Tr. 1392:5-14 (Treat); login details for the Company's tax account with the City of New York, see Tr. 1392:15-19 (Treat); information regarding the Company's account with Oxford Insurance, see Tr. 1393:1-3 (Treat); information regarding the Company's furniture supplier, see Tr. 1393:4-13 (Treat); information regarding who was representing the Company in a lawsuit that was pending in early 2016, see Tr. 1393:14-23 (Treat); a list of the vendors the Company paid directly from its Citibank account, see Tr. 1394:2-5 (Treat); a list of suppliers and their contact details who are paid on the Company's Chase Bank credit card, see Tr. 1394:7-11 (Treat); and any and all other information relating to the software product Agencypad stored on the Amazon or Rackspace accounts, any and all other information related to the Company's tax filings, including copies of its tax filings, and any and all other information related to the Company's bank statements, invoices, and other records relating primarily to the Company.

The evidence adduced at trial plainly establishes that the Company had a possessory interest in the above-mentioned information and that Zetler interfered with that interest by failing to provide the information to Treat after he was terminated as president. See Email from Treat to Zetler dated March 8, 2016, Pl. Ex 148; Tr. 1390-94 (Treat). Accordingly, the Court finds

44

Zetler and the LLC liable on Count IX for converting the Company's business records and access codes to the above-listed information.

## C. **Counts VI and VII: Breach of Fiduciary Duty**

Plaintiff seeks monetary damages and injunctive relief in connection with purported breaches by Zetler of his fiduciary duties while he was president of the Company. These breaches include: (1) Zetler's use of the Company's financial resources to host Rapid Systems' products and services on the Company's Amazon and Rackspace accounts; (2) Zetler's use of the Company's financial resources to pay invoices owed by Rapid Systems; (3) Zetler's transfer of the registrations for cdsglobal.com, agencypad.com, and creativefile.com from the Company to his LLC; (4) Zetler's use of the Company's resources to pay Rapid Systems $260,000 in "consulting" fees; (5) Zetler's usurpation of the Company's "comp card" business; and (6) Zetler's use of the Company's legal counsel to further his own private interests. See Pl. Mem. at 67-68.

Zetler argues that plaintiff fails to prove that these transactions were unfair to the Company or, in the alternative, that the Company is entitled to damages. Zetler also argues that he has established his affirmative defenses of acquiescence, ratification, and waiver. See Def. Mem. at 33.[26]

---

[26] Zetler also pleads affirmative defenses of unclean hands, laches, and statute of limitations. Zetler does not raise these claims in his post-trial briefing, and the Court finds no support for them in the record. Among other things, all of the relevant

As mentioned previously, C.D.S. Inc. is a Delaware corporation. Compl. ¶ 5. Under Delaware law, the president of a company has a fiduciary duty to the company and its shareholders to act in good faith and in the company's best interests. See Amalgamated Bank v. Yahoo! Inc., 132 A.3d 752, 780 (Del. Ch. 2016) ("Officers are corporate fiduciaries").

Where a fiduciary stands on both sides of a transaction, the fiduciary has the burden of establishing its entire fairness, including fair dealing and fair price. Carlson v. Hallinan, 925 A.2d 506, 529-31 (Del. Ch. 2006). To establish entire fairness, a fiduciary must prove that he or she not only actually disclosed to the company and its shareholders all material information necessary to acquaint the company and its shareholders with the nature of the transactions, but also that the transactions served a valid business purpose benefitting the company. See Technicorp Int'l II, Inc. v. Johnston, No. Civ. 15084, 2000 WL 713750, at *45 (Del. Ch. May 31, 2000) ("[i]f corporate fiduciaries divert corporate assets to themselves for non-corporate purposes, they are liable for the amounts wrongfully diverted").

The Court considers each alleged breach in turn:

---

acts of which plaintiff complains took place within three years of plaintiff's filing suit, as required by the statute of limitations. As regards Zetler's separately pleaded defense of participation, the Court finds that, on the facts presented, the defense is duplicative of Zetler's ratification defense and Zetler does not separately argue it in his post-trial briefing.

## 1. **Data Storage / Amazon and Rackspace Accounts**

Plaintiff argues that Zetler breached his fiduciary duties to the Company by using the Company's resources to pay for costs and expenses relating to Rapid Systems' products and services. See Pl. Mem. at 67; Compl. ¶ 130. Specifically, plaintiff contends that Zetler, without authorization, hosted various Rapid Systems products and services on accounts with Amazon Web Services and Rackspace, which accounts belonged to, and were paid for by, the Company. Plaintiff seeks money damages (Count VII) as well as injunctive and declaratory relief regarding the Company's ownership of the Amazon and Rackspace accounts (Count VI). See id. ¶ 123; Joint Consent Pre-Trial Order at 4, Dkt. 404 (seeking injunctive relief requiring defendants surrender all of the Company's rightful property).

Zetler contends that his LLC is the rightful owner of the Amazon account, in which name the account is registered, and that Marechaux agreed that the Company would shoulder various Rapid Systems costs and expenses in lieu of paying Zetler a salary. Thus, although Zetler does not mention these data storage charges specifically in his post-trial briefing, according to Zetler all of the various charges challenged by plaintiff were part of "an ongoing agreement to share costs between the companies, which was never reduced to writing." Def. Mem. at 35.

In order to defeat liability on this claim, Zetler must show that his decision to host Rapid Systems' products and services on the Amazon and Rackspace accounts was entirely fair to the Company. In this regard, certain facts are uncontested and clearly established. For many years, Zetler housed a database called "Portfolio" on space leased from Rackspace and from a company called Expert Host, the leases of which his wholly-owned companies owned, controlled, and, it appears, paid for. See Def. Ex. 267. In or about 2013, when the parties began developing Agencypad, Zetler opened a new account at Amazon to house Agencypad. Id. At all times relevant (i.e. until after Zetler was terminated as president of the Company), plaintiff, not Rapid Systems or the LLC, paid for this Amazon server space. See Tr. 992:10-14 (Viollon) (testifying that "C.D.S. Inc. was paying for" the Amazon account); Tr. 1861:1-2 (Zetler) (testifying that he had CDS, Inc. paying for the Amazon server the whole time); Tr. 1861:23-5 (Zetler) (testifying that plaintiff was "paying for the entire account, which was being used by CDS SARL, CDS, Inc. and Rapid Systems").

Although Zetler claims that he opened the Amazon account on behalf of Rapid Systems, see Tr. 1860:20-22 (Zetler); Email from Zetler to Viollon dated April 5, 2016, Pl. Ex. 146 (stating his view that the Amazon account has "always been" a CDS LLC account),

48

this testimony is not credible.[27] For example, Zetler points to no documents supporting his position that, while he was president of the Company, he was authorized to register an account that would be paid for by the Company and that would house the Company's primary asset, in effect, in his own name. See In. Tr. 35 (Marechaux) (testifying that Zetler did not have permission to open the Amazon account in the name of his LLC); id. 37 (Marechaux) (testifying that Zetler had no permission to transfer LLC expenses to the Company).

Moreover, when Zetler opened the Amazon Account, his colleagues believed that the Company owned the account, which was why the Company was paying for it. See Tr. 992:12 (Viollon) (testifying that he thought C.D.S. Inc. owned the Amazon account); Email from Jerome Viollon to Bradley Zetler dated April 4, 2016, Pl. Ex. 146 (noting his understanding that, after Zetler was terminated, Zetler "transferred accounts such as Rackspace and Amazon" to his name from CDS Inc.). Thus, the Company, not the LLC, is the rightful owner of the Amazon account.

---

[27] One reason that Zetler says he owns these accounts is because they include all of his products and services. But that is because he migrated his products and services from an account he owned and paid for to this account paid for by the Company. While this does not convert these products and services into assets of the Company (and the Company does not contend that they do), it also does not convert the account into an asset of Rapid Systems.

49

The court turns next to the question of whether Zetler violated his fiduciary duties to the Company by hosting Rapid Systems' products and services on the Amazon account. It is undisputed that Zetler housed more than just Agencypad and its database on the account: Zetler integrated Agencypad into his existing "Portfolio" database and migrated that entire database including, the entire Portfoliopad product, from Rackspace to the new Amazon server. From a technical standpoint, integrating Agencypad with Portfoliopad allowed clients of both programs to access certain information used by both programs. For example, an agency's list of models could be stored once on the Amazon server and be available to the agency's users regardless of whether they were using Portfoliopad's functions to manage the model's images, or Agencypad's functions to manage the model's bookings.

Although it may have been possible to house Agencypad's unique data separately from Portfoliopad's unique data, with Rapid Systems and the Company splitting the storage costs, this possibility was not addressed at trial. What we know is that the Amazon servers ended up running all of Rapid Systems' products and therefore the Company ended up paying all of the bills (i.e. the Company paid for Agencypad's and Portfoliopad's data storage costs as well as the data storage costs for several other Rapid Systems' products and services including Castingpad and Productionpad). See

Tr. 1860:15-19 (Zetler) (testifying that the Amazon server housed Castingpad, Portfoliopad, Productionpad, and Agencypad).

The question with respect to plaintiff's breach claim, then, is whether, by hosting the entire "Portfolio" database on the Company's account, Zetler improperly used the Company's funds to pay Rapid Systems' expenses and, if so, what damages are owed. Putting to one side whether Zetler met his burden to show that he disclosed all material information related to his decision to host the entire "Portfolio" database at the Company's expense, as regards Portfoliopad's data, even if Zetler breached his fiduciary duty by hosting it on the Company's account his affirmative defenses to this claim are sound. Treat and Gugnishev, for example, knew that Agencypad and Portfoliopad shared a database and that both were hosted on the Company's account.[28] See Email from Treat to Zetler dated March 8, 2016, Pl. Ex 148 (stating that she is legally entitled to "a log in and password for the [Amazon] account as an administrator") (emphasis added); Tr. 133:3-6, 134:16-25 (Gugnishev) (testifying that Zetler decided that Agencypad would share the same database with Portfoliopad). While Marechaux may

_____

[28] The Company did receive a benefit for this, namely the use of the tables that were originally developed for Portfoliopad. Zetler, however, was quite well compensated for giving Agencypad the use of these tables because he was able to offload the entire and quite substantial cost of housing Portfoliopad's data onto the Company.

not have understood that the Amazon account was hosting Portfoliopad, he should have. Zetler had every reason to believe, based on the way these programs worked, that Marechaux knew that Portfoliopad was housed on the Company's Amazon account.

As regards Productionpad, Castingpad, and the other Rapid Systems' products and services on the Amazon account, Zetler failed to carry his burden to show that he disclosed that the Company was paying for these storage costs and failed to show that the Company benefited from his decision to house these programs on the Company's account. Moreover, Zetler's affirmative defenses with respect to these programs are unavailing. Although Marechaux should have known, because of the way Agencypad was designed, that it shared a database with Portfoliopad, there is no reason Marechaux would have thought that the Company was paying for other Rapid Systems' products that were not sold with Agencypad unless he had been explicitly told so. Although Zetler claims that he had permission to offload these costs on the Company, his own emails suggest he did not. See Email from Bradley Zetler to Jerome Viollon dated Wednesday April 6, 2016, Pl. Ex. 146 (noting that "you and Jerome Marechaux have been unaware that CDS INC was paying certain expenses for CDS LLC/Rapid Systems"). Therefore, the Court finds Zetler liable on Counts VI and VII for hosting certain Rapid Systems' products and services on the Company's Amazon account.

Nonetheless, plaintiff fails to marshal evidence of how much these additional services cost the Company. Plaintiff seeks either the full amount of the Amazon bill paid by the Company, $228,224.06, or, in the alternative, for Zetler to "pay back cDs Inc. for the remaining losses." Pl. Mem. at 79. Thus, as plaintiff appears to concede, a substantial portion of the bill was properly paid by the Company. Additionally, plaintiff never supplied a calculation of damages pursuant to Rule 26(a) despite multiple requests from defendants. Accordingly, with respect to the Amazon account, the Court awards plaintiff declaratory and injunctive relief on Count VI, as set forth in Part IV, infra, but no damages on Count VII.[29]

Separately, plaintiff argues that Zetler breached his fiduciary duty by hosting Rapid Systems products and services on the Company's Rackspace account. Zetler, without mentioning this account in particular, argues that the Company properly paid for various Rapid Systems expenses as part of an oral agreement with Marechaux regarding cost-shifting. See Def. Mem. at 34.

_____

[29] As the Court finds, for the reasons stated above, that plaintiff is the rightful owner of the Amazon account, the Court also finds in favor of plaintiff on Count III. See Compl. ¶ 96 (seeking a declaration from the Court that the Company "is the owner of the Amazon account and that Amazon and/or Zetler must provide" the Company with the "passwords, access codes and/or other information necessary for" the Company to access its account).

By way of brief background, in or about 2011 Zetler set up an account with Rackspace known as the "Reseller Account." See Def. Ex. 267. The account was established in the Company's name and was used to host the cdsglobal.com email addresses as well as email accounts for modelling agency clients, which was a Rapid Systems service. Id. At all times relevant, the Company paid the bills for the Reseller Account. See Tr. 1860: 10-14 (Zetler) (testifying that "there was a reseller e-mail account, which was in the name of CDS, Inc., which CDS, Inc. was paying for").

There is no evidence in the record supporting Zetler's contention that the Company knew that this account was hosting the email accounts for Rapid Systems' modelling agency clients. Moreover, there is no business reason why the Company would need its email accounts to be hosted on the same account used to host Rapid Systems' client email business. To the contrary, the record plainly demonstrates that the Company did not know it was paying for these other email services. See Email from Bradley Zetler to Jerome Viollon dated Wednesday April 6, 2016, Pl. Ex. 146 (noting that "you and Jerome Marechaux have been unaware that CDS INC was paying certain expenses for CDS LLC/Rapid Systems"). Zetler fails to establish acquiescence or waiver because the Company did not even know that it was paying these expenses until after Zetler was

terminated. Id.[30] Therefore, the Court finds Zetler liable on Counts VI and VII for hosting Rapid Systems' email services on the Company's Rackspace account at the Company's expense.

Nonetheless, plaintiff fails to establish its damages. Again, plaintiff seeks the full amount the Company paid to Rackspace over the life of the account: $218,958.98. While Viollon testified that this was the sum of three separate amounts charged for three different accounts ($150,514.68; $41,315.91; and $27,128.39), the record does not reveal which of these charges was for the cdsglobal.com emails (and they may have been part of all three). See Tr. 1003:21-25, 1004:1-2 (Viollon). As it surely was proper that plaintiff be charged for the cdsgloal.com emails, and plaintiff does not establish which portion of these bills were attributable to Rapid Systems expenses, the Court awards no damages on Count VII as regards the Rackspace account. The Court does, however, award declaratory and injunctive relief on Count VI as set forth in Part IV, infra.[31]

_____

[30] Unlike with the Amazon account, the Rackspace account was originally set up in the Company's name. See Tr. 1003:6-19 (Viollon). After Zetler was terminated, he spliced the account, giving parts to the Company but keeping the cdsglobal.com emails in an account that he continues to control.

[31] As the Court finds, for the reasons stated above, that plaintiff is the rightful owner of the Rackspace account, the Court also finds in favor of plaintiff on Count IV. See Compl. ¶ 107 (seeking a declaration from the Court that the company "is the owner of the Rackspace account and that Rackspace and/or Zetler must provide"

55

## 2. **Invoices**

While president of the Company, Zetler paid a variety of Rapid Systems' bills using the Company's funds. Zetler has the burden to prove that these transactions were entirely fair to the Company. Entire fairness includes fair dealing and fair price. See Carlson, 925 A.2d at 531 (noting that "[f]air price includes all relevant factors relating to the economic and financial considerations of the proposed transaction" and "[f]air dealing focuses on the actual conduct of corporate fiduciaries in effecting a transaction, such as its initiation, structure, and negotiation").

These bills fall into two categories: invoices from Guava Software and miscellaneous expenses.

Zetler used the Company's funds to pay a series of bills from Guava Software for Robert Nagel's software development work. While Marechaux and the Company were aware of these transactions, see Tr. 1093:13-1094:17, 1105:12-1106:14 (Viollon), they were not aware of what products they were for. See Email from Zetler to Viollon dated September 19, 2014, Def. Ex. 187 (stating that one of these charges was to pay Rob Nagel for "development costs"); Email from Zetler to Viollon dated November 19, 2014, Def. Ex. 191 (stating that one of these charges was to pay Rob Nagel for "development work").

_____

the Company with the "passwords, access codes and/or other information necessary for" the Company to access its account).

Marechaux and Viollon were under the misimpression that these bills were for work relating to Agencypad or other Company business. See Tr. 1001:8-10, Tr. 1005 (Viollon) (testifying that he only learned later what this work was for); Tr. 1001-1002 (Viollon) (testifying that when he received the actual invoices for the sales tax audit he saw that the bills were for Rapid Systems products). Zetler did not turn over these invoices at the time, but only during an audit in November 2015. See Tr. 1852-53 (Zetler). As Zetler cannot show that he disclosed all material facts regarding these transactions and these transactions served no business purpose for the Company, he is liable on this claim.

Although some evidence suggests that the Company paid some Rapid Systems bills as part of an agreement to compensate Zetler for his efforts on behalf of the Company, Zetler has failed to establish his defenses of acquiescence, waiver, and ratification with respect to these Guava Software invoices. Importantly, the Company paid these expenses before Marechaux or Viollon knew that they were for Rapid Systems' products and services.[32] And, a few months after Marechaux and Viollon learned of their true nature, he terminated Zetler as president of the Company. Therefore, the

---

[32] Zetler later admitted that he had charged things to the Company that Marechaux and Viollon were unaware of. See Email from Zetler to Viollon dated April 6, 2016, Pl. Ex. 146 ("you and Jerome Marechaux have been unaware that CDS INC was paying certain expenses for CDS LLC/Rapid Systems").

Court finds that Zetler breached his fiduciary duty by paying these expenses with the Company's funds. Accordingly, the Court awards plaintiff money damages in the amount of $47,277.44 on this aspect of this claim. Tr. 999 (Viollon).

However, with respect to the miscellaneous expenses, which total $18,577.21, plaintiff has failed to establish that Marechaux and the Company were unaware of them at the time, or even when the bills were paid. The relevant expenses include charges to the Company's credit card at a restaurant in South Africa in the amount of $977.76, a phone purchase of $478.50, a press "touchup" for 1,445.88, a service called PSD2 HTML for $11,209.40, and two website-related expenses for $216 and $291.73. See Tr. 1002, 1004 (Viollon). Viollon knew of these purchases around the time they were made and there is no evidence that he was under any misimpression about what they were for. Therefore, even if Zetler failed to carry his burden to show entire fairness, he prevails on his affirmative defenses on this aspects of this claim. Accordingly, the Court finds against plaintiff with regard to the miscellaneous expenses.

### 3.  Consulting Fees

Plaintiff argues that Zetler breached his fiduciary duty to the Company by paying himself two consulting fees totaling $260,000. The first fee for $150,000 was paid on October 31, 2013. See C.D.S. Inc. Citibank Account Statement dated October 26-

November 27, 2013, Pl. Ex. 163. The second fee for $110,000 was paid in March 2014. See Tr. 1138-49 (Viollon). While Zetler admitted that these fees were not for services rendered to the Company, but for equalizing income with Marechaux, see Tr. 1859 (Zetler), the record is clear that Marechaux approved of these payments and waived his right to challenge them now, see Email from Marechaux to Zetler dated November 14, 2013, Pl. Ex. 133; Tr. 1857 (Zetler) (approving the "150k" payment); Tr. 1138-49 (Viollon). Thus, even if these payments were not entirely fair to the Company, Zetler prevails on his affirmative defenses. Accordingly, the Court finds Zetler not liable on Count VII as regards these fees.

### 4. **Michael Bunker Venture**

Michael Bunker is an old colleague of Marechaux's from when he was a model. See Tr. 763:18 (Marechaux). In 2013, Bunker approached Marechaux about a joint venture in the "comp card" business. See Tr. 764:1 (Marechaux). Bunker and the Company agreed to split the profits of the venture 50-50. See Tr. 766:9 (Marechaux). Plaintiff argues, first, that Zetler improperly entered into a side project with Bunker called "TMU" that benefited Zetler and his companies solely, see Pl. Mem. at 68; Tr. 795:7-16 (Marechaux); second, that Zetler improperly terminated the Company's joint-venture with Bunker, see Tr. 809:20 (Marechaux), because the TMU project had gone badly, see Tr. 795 (Marechaux);

and third, that Zetler subsequently set up a new version of the comp card joint-venture with Steve Ullman and kept all of the profits for himself, see Tr. 810 (Marechaux); Pl. Mem. at 72. Zetler addresses this issue in one sentence in his brief, arguing that even if the relevant business opportunity in comp cards existed, plaintiff's breach claim is supported by nothing but speculation about lost profits. See Def. Mem. at 35.

First, with regard to the TMU project, Marechaux was entirely aware that Zetler set up this side venture with Bunker. Marechaux testified that he did not want the Company to be a part of it. See Tr. 795 (Marechaux) ("TMU was another project that I refused to be a part of it because it was far from the core business of CDS"). Therefore, Zetler is not liable for breach on this basis.

Second, with regard to the termination of the "comp card" joint-venture, it may be true that Zetler terminated the venture after his relationship with Bunker soured as a result of the TMU project. See Tr. 795 (Marechaux) (testifying that "the fact that Mr. Zetler got an issue with Michael Bunker [in the TMU project], it stopped everything [the comp card project]"). But Zetler told Marechaux that the Company needed to terminate its venture with Bunker because Bunker was a liar. Plaintiff, therefore, fails to rebut the presumption that Zetler was acting in good faith when he broke off this business with Marechaux's full knowledge.

.

Accordingly, Zetler did not breach his duties to the Company when he terminated the Company's joint-venture with Bunker.

Third, with regard to the comp card venture with Steve Ullman, Zetler plainly told Marechaux that it would be done on the same terms as the Bunker venture. See Email from Zetler to Marechaux dated August 6, 2015. Pl. Ex. 29 (stating "as we discussed a few months ago I would try to make a deal with Steve from Depicture for us to carry on the printing" and that that "deal is basically done on the same terms we had with Bunker"). Under the old agreement, the Company received 50% of the proceeds, see Joint Venture Agreement – Letter of Intent, Pl. Ex. 174, amounting to approximately $15,000 per year at the time Zetler terminated the venture, see Tr. 1076 (Viollon); Email from Viollon to Zetler and Marechaux dated August 4, 2015, Pl. Ex. 185 (calculating the income earned from the joint venture). But the Ullman venture was conducted to the exclusion of the Company, even though it used the Company's asset, creativefile.com, see Tr. 810-813 (Marechaux); none of the profits from the new venture were shared with the Company. Therefore, the Court finds that Zetler breached his fiduciary duty to the Company by usurping the Ullman business opportunity.

Nonetheless, plaintiff has not marshalled sufficient relevant evidence on damages. Plaintiff points only to "lost profits" from the Bunker venture, an estimate of the damages for Zetler's

misappropriation of the business opportunity with Ullman. See Pl. Mem. 79. But these historical profits are wholly inapposite, as they do not establish one way or the other whether the Ullman venture generated profits. Plaintiff, here, is entitled only to damages in the amount of profits Zetler earned by misappropriating the Ullman venture. In the absence of any evidence regarding the profits Zetler earned from the Ullman venture, plaintiff cannot recover damages on this claim. However, plaintiff is entitled to equitable relief as set forth in Part IV, infra.

## 5. Domain Ownership

Plaintiff argues that Zetler breached his fiduciary duty to the Company by secretly transferring ownership of three domain names – cdsglobal.com, creativefile.com, and agencypad.com – to his LLC while he was president of the Company. See Complaint ¶ 123. The evidence suggests that the Company has been paying for these domain names for years. See Tr. 998 (Viollon) (testifying that the Company paid the Expert Host bills). Zetler argues, inter alia, that he owns creativefile.com and cdsglobal.com because he originally registered both domains and because the other evidence presented at trial regarding the registrants of these names is unreliable. See Def. Mem. at 29-31.

As discussed earlier, during the relevant period, these domains belonged to the Company, not to Zetler. In 2015, while he was still president, Zetler transferred the registration of these

domains to his LLC. He points to no evidence that he informed Marechaux of this transfer or otherwise received approval for his decision to shift the Company's assets to his LLC. Nor does he explain how his affirmative defenses apply here. Accordingly, the Court finds Zetler liable on Count VI for transferring ownership of three domain names to his LLC. Equitable relief as regards these domains is discussed in Part IV, infra.

### 6. Legal Counsel

Plaintiff argues that Zetler breached his fiduciary duty to the Company by improperly using the Company's lawyers to solicit advice adverse to the Company's interest. See Pl. Mem. at 68. According to plaintiff, the law firm of Morrison & Cohen was first engaged by the Company to handle a third-party legal issue and to provide legal assistance relating to the Company's termination of its joint-venture with Bunker. Id. at 57. After his termination, Zetler used the firm to file a trademark application registration for Agencypad on behalf of his LLC. See Pl. Ex. 9; Tr. 1416 (Treat). While plaintiff has established that Zetler used the firm after he was terminated, plaintiff has failed to establish that Zetler used the firm improperly during the time that he was president. Therefore, the Court finds Zetler not liable on Count VII with respect to his use of the Company's legal counsel.

63

## D. **Count VIII: Theft of Trade Secrets**

Plaintiff claims that Zetler and the LLC stole the Company's trade secrets and used them to compete unfairly with the Company.[33] See Pl. Mem. at 62-65. Specifically, plaintiff argues that defendants stole Agencypad and its source code and misused information that the Company provided to Rapid Systems for the purpose of calculating commissions under the EDA to sell Agencypad to the Company's customers. Id. at 62. Plaintiff seeks an injunction (1) prohibiting defendants from selling Agencypad, (2) requiring defendants to return the Agencypad source code, and (3) prohibiting defendants "from using the Company's customer information in its sales efforts."[34] Id. at 65.

Defendants do not address Count VIII in their post-trial briefing, other than to point to arguments made by counsel at trial on February 8, 2018 regarding whether Count VIII turns on questions of law or whether it raises questions of fact distinct from those

---

[33] Plaintiff's complaint claims that defendants misappropriated the Company's "business processes" and "marketing techniques." Plaintiff does not mention these trade secret categories in its post-trial briefing and fails to establish defendants' liability at trial with respect to them. Accordingly, the Court finds Zetler and the LLC not liable on Count VIII for misappropriating the company's "business processes" and "marketing techniques."

[34] Plaintiff also requests an injunction requiring defendants to return all software tools associated with Agencypad, see Pl. Mem. at 65, and the Amazon server, see Tr. 2099. As the Court provides this relief as a remedy elsewhere, see Part V infra, it does not separately consider these issues in the context of this Count.

raised by other parts of plaintiff's complaint. See Def. Mem. at 35 ("Rapid Systems respectfully refers to the argument presented at the hearing conducted by the Court on the afternoon of February 8, 2018); Tr. 2091-2101. During the February 8 oral argument, defendants admitted that they used information about the Company's customers to sell those customers the Agencypad/Portfoliopad bundle following termination of the EDA in 2017. See Tr. 2095. Thus, defendants contest liability on Count VIII only on the ground that the EDA permitted them to use the Company's client information in their sales efforts (or at least did not prohibit such use).[35]

Defendants, however, cite no passage of the agreement, conferring upon them any rights as regards Agencypad or its source code (indeed they are precluded from so arguing by the decisions

---

[35] The parties here agree that the client information at issue, contained in the client's contracts with the Company, are trade secrets. See N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 44 (2d Cir. 1999) (internal quotations and formatting omitted) (defining a trade secret as "any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it.") (internal quotation omitted). In determining whether information constitutes a trade secret, courts generally consider: "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." Id.

rendered in France). Accordingly, the Court finds Zetler and the LLC liable on Count VIII for misappropriating the Agencypad source code and selling it to the Company's customers (prongs 1 and 2 mentioned above).

As regards defendants' use of the Company's client information (prong 3), plaintiff's claim involves four separate questions: (1) whether defendants are entitled to use the Company's "customer list" (i.e., information regarding the identities of the Company's customers gleaned from the contracts provided under the EDA) to sell Portfoliopad to those customers; (2) whether defendants are entitled to use the Company's customer list to sell those customers other products (not including Agencypad); (3) whether defendants are entitled to use information in the Company's contracts regarding the pricing and terms of use of Portfoliopad in order to sell those clients Portfoliopad; and (4) whether defendants are entitled to use information in the Company's contracts regarding the pricing and terms of use of Agencypad (as distinct from Portfoliopad, i.e. the booking software component of the bundle) in order to sell, directly or through a distributor, Agencypad or any other Rapid Systems product, including products that compete with Agencypad, to those or any other customers.[36]

---

[36] Although Zetler was aware of all three of these categories information in his capacity as president of the Company, defendants make no argument that they would be entitled to use the information on that basis. Therefore, the only question before the Court is

As regards the Company's "customer list," defendants were barred by the plain terms of the EDA from using this information to sell Portfoliopad to the Company's clients for a period of ninth months beginning in June 2017. See EDA § 19.1 ("RS warrants and undertake [sic] in favour of CDS that within the Territory it shall not for a period of 9 (Nine) months reckoned from the date this Agreement terminates ("the Termination Date") . . . be concerned or interested or involved, either directly or indirectly, in the sale or licensing of the Portfoliopad System to any Agency who is a party to a Service Subscription Agreement as at the Termination Date."); id. § 2.1.4 (defining "Service Subscription Agreement" as "the written agreement concluded between CDS and the Agency in terms whereof the Agency is allowed access to and may utilise the Portfoliopad System, on the terms and conditions contained therein"); id. (defining "Agency" as "the model, talent and artist agencies that enter into a Service Subscription Agreement"). By its terms, the EDA, therefore, implies that defendants may sell Portfoliopad to the Company's clients beginning on March 1, 2018.

As regards defendants' use of this information to sell other products, plaintiff fails to establish that the EDA prohibits such use. Although "[a] customer list developed by a business through substantial effort and kept in confidence may be treated as a trade

whether defendants are entitled to use this information pursuant to the EDA.

secret and protected at the owner's instance against disclosure to a competitor," N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 44 (2d Cir. 1999), the customer list in this case was shared by the Company with defendants pursuant to the EDA, see EDA § 7.1 (requiring the Company to "keep RS constantly informed of their respective customer[s] under subscription), and the EDA does not restrict defendants' right to use this information regarding the identities of its customers in other sales efforts.

Although defendants' sales of Portfoliopad to the Company's clients between June 1, 2017 and February 28, 2018 appear to be a breach of § 19.1 of the EDA, the Court declines to view this activity as a misappropriation of trade secrets. Among other things, this information was not otherwise protected under the contract and the agreement contemplates its use by defendants. Moreover, the EDA has a binding forum selection clause in favor of the French courts, requiring such disputes to be adjudicated in Paris. See id. § 26 (stating that "[a]ll disputes arising with the present Agreement shall be finally settled by the Paris Commercial Court"). Therefore, the Court finds Zetler and the LLC not liable on Count VIII as regards their use of clients' identities, gleaned from the Company's contracts, to sell those clients Portfoliopad and various other products.

As regards the use of information in the Company's contracts, i.e. their substantive terms including pricing, defendants are

68

entitled to use this information to sell Portfoliopad in so far as the information relates to Portfoliopad. In other words, in so far as the contracts for the Agencypad/Portfoliopad bundle include specific terms regarding the use of Portfoliopad or the cost of Portfoliopad, the Court finds that Zetler and the LLC are not liable on Count VIII because they used that information to sell Portfoliopad.[37] The EDA requires that this information be shared with Rapid Systems and puts no restrictions on its use by Rapid Systems following the EDA's termination.

As regards the use of information in the Company's contracts, i.e. their substantive terms including pricing, defendants are not entitled to use this information in so far as it relates to the Agencypad portion of the Agencypad/Portfoliopad bundle. Although the Company's contracts for the Agencypad/Portfoliopad bundle were provided to Rapid Systems pursuant to the EDA, the EDA says nothing about Rapid Systems' right to receive and use information regarding products other than Portfoliopad. Indeed, Rapid Systems' receipt of this information was an incidental byproduct of the Company's decision to sell Portfoliopad alongside other products in a single contract. Defendants have identified no provision of the EDA which would give Rapid Systems a right to use such superfluous

---

[37] Again, the Court does not consider whether this activity, in so far as it took place between June 1, 2017 and February 28, 2018, was otherwise a breach of § 19.1.

69

information.[38] Thus, the Court finds Zetler and the LLC liable on Count VIII for misappropriating the Company's trade secrets by using information in the Company's contracts not relating to Portfoliopad to sell products and services other than Portfoliopad, including Agencypad, to the Company's customers.

### E. **Count V: Computer Fraud**

Plaintiff argues that defendants violated the Computer Fraud and Abuse Act ("CFAA"), including 18 U.S.C. § 1030(a)(5)(C), which prohibits, inter alia, persons from accessing a protected computer or computer system without authorization (or in a way that exceeds authorized access), causing any impairment, however slight, to the integrity or availability of any data, program, information, or code on a computer or computer system, causing a loss of at least $5,000.

The relevant computers here are the Amazon and Rackspace servers hosting Agencypad and the cdsglobal.com emails. Plaintiff contends that Zetler accessed both of these servers, which plaintiff owns, and locked plaintiff out of them, preventing plaintiff from accessing its computer code, its client's data, and its emails. See Pl. Mem. at 58-59; Compl. ¶¶ 108-117.

---

[38] In fact, as Zetler testified, the EDA has a provision that forbids Rapid Systems from competing with "the distributors," i.e. the company and CDS SARL. See Tr. 1561 (Zetler) (discussing § 5.3 of the EDA).

Defendants argue that they did not exceed authorization when they locked the Company out of these servers as defendants owned them. This argument fails because, as set forth previously, defendants did not own these accounts.

Defendants also argue that plaintiff cannot recover attorneys' fees under the CFAA, that the only recoverable damages under the Act are the costs of remedying harm to computers, and that the Company has not established an element of its CFAA claim: $5,000 of losses. See Def. Mem. at 33.

The Court finds that Zetler plainly accessed Amazon and Rackspace in a way that exceed authorized access and impaired the availability of information on these computers. For example, Zetler failed to give Treat passwords to the Amazon and Rackspace accounts and prevented Gugnishev from accessing Agencypad, the cdsglobal.com emails, or the Company's data. See Tr. 195:5-7 (Gugnishev) (testifying that his access to the Amazon server was revoked on April 21, 2016); Tr. 1391:1-8, 1398:13-14 (Treat).

Plaintiff, however, fails to establish a loss of at least $5,000. The only relevant evidence in the record, it seems, is Treat's testimony that the Company's business would falter without access to Agencypad. See Tr. 1418 (Treat) (testifying that prior to the lock-out only the Company sold Agencypad in the United States); Tr. 1422 (Treat) (testifying that Mainboard started selling Agencypad in the United States including to the Company's

existing clients); CDS Inc Sales by Product/Service Summary, January – December 2015, Pl. Ex. 40 (showing that the Agencypad/Portfoliopad bundle grossed $728,405 in North America in calendar year 2015); In. Tr. 180 (Treat) (testifying that the Company would go out of business without access to the Amazon account). But plaintiff provides no estimate of the harm, nor does plaintiff point to any damages calculation in its post-trial briefing. Instead, plaintiff points to "its attorneys' fees pursuing its necessary access and the Special Master fees it has paid to date." Pl. Mem. at 62.

The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring ... the system ... to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11) (emphasis added). In certain circumstances courts have found that attorneys' fees constitute losses. See Facebook, Inc. v. Power Ventures, Inc., 252 F. Supp. 3d 765, 778 (N.D. Cal. 2017) (awarding $74,690.50 in legal fees incurred in negotiations with defendants). Although such fees and expenses may be cognizable losses under the broadly-defined terms of the Act, plaintiff has submitted no evidence of the amount of such fees (an element of its claim). Accordingly, the Court finds defendants not liable on Count V.

### F. **Plaintiff's Other Claims**

Plaintiff also asserts unjust enrichment (Count X) and faithless servant (Count XI) claims. See Pl. Mem. at 77, 80.

As regards Count X, which plaintiff asserts in the alternative, plaintiff seeks a constructive trust over various assets defendants purportedly purloined while Zetler was serving as the Company's president, including the consulting fees discussed earlier. See Compl. ¶ 168. Defendants do not directly address this Count in their brief. See Def. Mem. at 36.

In so far as plaintiff seeks a trust over assets for which the Court already granted relief in connection with one of the first nine counts of plaintiff's complaint, the Court dismisses this Count as moot. In so far as plaintiff seeks a trust over various monies that the Court did not award plaintiff in connection with one of the first nine counts, the Court finds against plaintiff for the same reasons as stated previously. As regards the consulting fees, the Court finds that it is not unjust to permit Zetler to retain this benefit from the Company where Marechaux, the Company's only other shareholder, agreed that the Company should provide it. And while the Court found that Zetler improperly enriched himself at the Company's expense by paying certain Rapid Systems' expenses with the Company's funds, plaintiff failed to establish the amount of these expenses.

As regards Count XI, plaintiff seeks disgorgement of (1) 45 shares which Zetler owns in the Company and (2) the various monies which Zetler transferred from the Company to his LLC or Rapid Systems and various bills and expenses owed by his LLC or Rapid Systems which Zetler satisfied using the Company's funds. See Compl. ¶¶ 186-87.

Disgorgement is an equitable remedy designed to allow the Court to adjust the property rights of parties after-the-fact to conform them to what would have been the result had the fiduciary behaved properly beforehand. By and through the relief the Court grants plaintiff in connection with the other claims in this case, Zetler will be stripped of property he stole and the property rights of the parties will be restored to what they would have been had Zetler fulfilled his obligations as the Company's president. Where the Court has not ordered monies return to plaintiff, it is either because plaintiff failed to show that Zetler was not entitled to the monies or because plaintiff failed to establish the amount of monies it was owed in damages. Accordingly, the Court dismisses Count XI as moot in so far as it overlaps with prior counts in plaintiff's complaint.

As regards Zetler's 45 shares in the Company, in Guth v. Loft Inc., the case cited by plaintiff, the court stripped the defendants of shares of stock, which shares defendants acquired in connection with their inequitable conduct. 23 Del. Ch. 255 (1939).

Here, Zetler did not receive his 45% ownership stake in connection with the allegations in plaintiff's complaint. Accordingly, the Court finds Zetler not liable on Count XI as regards his 45% equity stake in the Company.

## III. **DEFENDANTS' COUNTERCLAIMS**

Defendants ("counterclaim plaintiffs") bring fourteen counterclaims against both the Company and six third-party defendants (the "Marechaux Parties"). Prior to trial, defendants withdrew three of these claims: Counts III, IV, and VII. Accordingly, these Counts are dismissed with prejudice. Now pending before the Court are four direct claims sounding in copyright infringement (Counts I and II) and fraud (Counts V and VI) and seven derivative claims brought by Zetler on behalf of the Company relating to SARL's development of the "cDs Online" software (Counts XII, XIII, and XIV), SARL's sales of the CDS6 software (VIII and IX), and SARL's sales of Agencypad (Counts X and XI).

The Court reviews each of these claims in turn:

### A. **Counts I and II: Copyright Infringement**

Rapid Systems argues that it established two types of copyright infringement by the Marechaux Parties at trial: (1) infringement in the Agencypad source code (the application that is stacked on top of the database) and (2) infringement in the Portfoliopad database (parts of which, the so-called "shared tables," are used by Agencypad). See Def. Mem. at 5. As the

75

Company, not Rapid Systems, is the sole and rightful owner of Agencypad, including the four copyrights registered by Rapid Systems in the application code, see Part II (A), infra, the Court finds the Marechaux Parties not liable with respect to the first kind of alleged infringement.

As regards the second kind of alleged infringement, Rapid Systems' argument, briefly, is as follows: Agencypad and Portfoliopad share a database, parts of which (the shared tables) are used by both applications to store and retrieve information. These shared tables were originally developed for Portfoliopad in 2001. After Rapid Systems terminated the Company's right to sell Portfoliopad under the EDA, the Company "unbundled" Agencypad from Portfoliopad and continued to sell Agencypad to its clients. But even though Portfoliopad's functions were disabled, every such sale of "'unbundled Agencypad' was a sale of Portfoliopad" because behind "the Agencypad user-interface lies the machinery of Portfoliopad's database [i.e. the shared tables], without which Agencypad cannot operate." Def Mem. at 13.

In response, the Marechaux Parties argue that they are not liable because, inter alia, Rapid Systems gave the Company permission to use the shared tables. See Pl. Mem. at 29. The Marechaux Parties also argue that the shared tables are, at best, a "thin" copyright interest, id. at 38, and that, on the facts of this case, counterclaim plaintiffs should be equitably estopped

from suing for infringement. See Plaintiff/Counterclaim Defendants' Answer to Defendant/Third-Party Plaintiff's Second Amended Counterclaims at 22, Dkt. 157.

To establish infringement, counterclaim plaintiffs must prove that (1) they hold a valid ownership interest in Portfoliopad; (2) the Marechaux Parties "actually copied" Portfoliopad; and (3) the Marechaux Parties' copying is illegal because a "substantial similarity" exists between Agencypad and the "protectable elements" of Portfoliopad. See Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc., 150 F.3d 132, 137 (2d Cir. 1998).

Under federal law, however, "[a] copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement." Graham v. James, 144 F.3d 229, 236 (2d Cir. 1998). [39] Here, even if counterclaim plaintiffs could establish a prima facie case of infringement, [40] they plainly gave the Company permission to use the shared tables. In fact, Zetler affirmatively wanted the Company to

---

[39] Nonexclusive licenses may "be granted orally, or may even be implied from conduct." Graham, 144 F.3d at 235.

[40] It is not clear, for example, that counterclaim plaintiffs have established that Agencypad, the Company's work, is substantially similar to Portfoliopad, the counterclaim plaintiffs' work, because the 30 shared database tables, which represent a fraction of the Agencypad and Portfoliopad code, may not be "quantitatively or qualitatively sufficient to support the legal conclusion that infringement (actionable copying) has occurred" Castle Rock, 150 F.3d at 138.

use these tables rather than undertake the relatively simple task of coding new ones. Thus Zetler directed Gugnishev and Nagel to incorporate the tables in Agencypad. See Email from Zetler to Riot and Marechaux dated September 13, 2010, Def. Ex. 98 ("agreed that this [Agencypad] is a new project, but definitely needs to merge with Portfoliopad. Only model and client contact database is affected and [the application] will probably need [to be] changed on [the] PP side as well to accommodate the booking. It is important that we have ONE unified platform that requires zero synchronization between applications"); Tr. 1926-29 (Nagel) (testifying that Agencypad was built with 30 tables he had originally written for Portfoliopad); Tr. 1935 (Nagel) (testifying that he contributed the database tables to Agencypad). When Zetler granted this nonexclusive license he did not place any time limit on its use. Counterclaim plaintiffs cannot now terminate the Company's rights to use this code. See 17 U.S.C. § 203. Accordingly, the Court finds the Marechaux parties not liable on Counts I and II.[41]

---

[41] The Court notes that in light of this determination, it does not reach various issues raised by the parties including whether the database code is even original copyrightable expression, whether Rapid Systems even owns the shared tables and fields, whether South African law applies to questions of ownership involving the shared tables and fields, whether counterclaim plaintiffs should be equitably estopped from bringing these infringement claims, and whether counterclaim plaintiffs, even if they could establish infringement, would be entitled to any relief given various equitable considerations.

78

## B. **Counts V and VI: Fraud**

Counterclaim plaintiffs seek damages for fraud from Marechaux, Riot, Viollon, Racle, and SARL (Count V) and for aiding and abetting fraud from Treat and the Company (Count VI). See SAAC ¶¶ 269-279. According to counterclaim plaintiffs, the Marechaux Parties fraudulently concealed SARL's development of a new generation of booking software in France known as "CDS Online" (the "Project), inducing counterclaim plaintiffs, to their detriment, to continue doing business with the Group. See Def. Mem. at 22.

In response, the Marechaux Parties argue, inter alia, (1) that neither SARL nor any of the third-party defendants had a duty to disclose the Project to counterclaim plaintiffs, see Pl. Mem. at 81; (2) that counterclaim plaintiffs adduced no evidence at trial that Marechaux, or the other third-party defendants, intended to harm Zetler, id.; and (3) that counterclaim plaintiffs adduced no evidence of harm, id. at 84.

In an action for fraud based on nondisclosure, in addition to proving concealment, scienter, justifiable reliance, and resulting injury by clear and convincing evidence, a plaintiff must show that the defendant had a duty to disclose the relevant information. See Dembeck v. 220 Cent. Park S., LLC, 823 N.Y.S.2d 45, 47 (2006); Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd., 85 F. Supp. 2d 282, 296 (S.D.N.Y. 2000), aff'd, 2 F. App'x 109 (2d

79

Cir. 2001) ("[i]n case of fraud resting on an alleged omission, plaintiff must allege facts giving rise to a duty to disclose") (collecting cases). A fiduciary relationship giving rise to a duty to disclose "does not exist between parties engaged in an arm's-length business transaction." Dembeck, 823 N.Y.S.2d at 47. For example, under New York law, a landlord is under no obligation to volunteer information to prospective tenants concerning contemplated future building repairs. Id. Generally, whether a duty exists turns on the nature and scope of the parties' relationship. Id.

As regards Riot, Viollon, Racle, and SARL, the Court finds that these third party defendants plainly had no duty to disclose the Project to counterclaim plaintiffs. Among other things, Riot, Viollon, Racle, and SARL had no agreements with counterclaim plaintiffs, oral or otherwise, to share business profits, which is the only theoretical duty that theory counterclaim plaintiffs advance in their post-trial briefs. See Def. Mem. at 20. Accordingly, the Court finds Riot, Viollon, Racle, and SARL not liable on Count V.

As regards Marechaux, Zetler argues that Marechaux had a duty to disclose the Project because he had "represented to Zetler that they were 'equal partners' working together to build a global business that would then, hopefully, be sold and they would split the profits [on a] 50/50 basis." Id. The evidence proffered by

counterclaim plaintiffs regarding this purported oral agreement, however, is inconclusive. See Tr. 942:6-12 (Marechaux) (testifying that he believed he and Zetler were "equal partners"), Tr. 1603-4 (Zetler) (testifying that he and Marechaux worked "quite closely together" and had discussed "the possibility of trying to find a buyer" for the entire business).

First, the Court notes that, before SARL began working on the Project, Zetler threatened to break up the "partnership," largely codified in the Franchise Contract, between Rapid Systems, the Company, and SARL. See Email from Zetler to Marechaux dated March 23, 2015 (the "March 23 Email"), Def. Ex. 197; Email from Zetler to Marechaux dated March 2, 2015 (the "March 2 Email"), Def. Ex. 197 ("I will not carry on like this for much longer"). Following the March exchanges, Marechaux and Zetler's relationship rapidly deteriorated, and Marechaux and Zetler eventually stopped speaking to each other entirely. See Tr. 1383 (Treat).

Second, while Zetler argues in his briefs that he would never have invested so much time and money in developing Agencypad if Marechaux had not induced him by "clear and unequivocal promises that he was an equal partner in the 'global company,'" this is not borne out by the evidence. See Def. Mem. at 21. Zetler is a sharp-elbowed businessman with a 45% interest in the Company and therefore in Agencypad. Zetler earned a lot of money from his

81

investment in Agencypad and the development of Agencypad allowed him to shift the costs of supporting Portfoliopad onto the Company.

Third, although Marechaux used the word "equal" to describe his relationship with Zetler, the Court finds that he did not mean that the two men were equal owners but, rather, something more like peers in the overall cDs business enterprise. See Email from Marechaux to Zetler dated November 14, 2013, Pl. Ex. 133 ("[s]aying I never saw you as an equal partner is completely wrong. I will never gave you the key of cDs inc if it was the case. You are the president, you have the complete control of the bank, the signature (I cannot access to the bank online, have no CB and its fine like that, I don't need it)"). Indeed, Marechaux and Zetler never reached an agreement to create a global holding company because Marechaux never agreed to a 50/50 ownership split. In fact, it likely was their failure to reach such an agreement that led Marechaux and Zetler's informal "partnership" to collapse. See March 23 Email (". . . you don't want a 50/50 partnership, you want a partnership where you can do what you want, when you want and not be accountable to anyone. If that is the case, we need to go our separate ways as I cannot accept that . . . If we can't find middle ground, then cDs is done").

Thus, the Court finds that Zetler and Marechaux never had a broader agreement binding either man on a going-forward basis to split revenue or to share ownership or control over their primary

entities (SARL in the case of Marechaux and Rapid Systems in the case of Zetler). See Tr. 1106:19-1107:5 (Viollon) (testifying that cost-sharing agreements were not reduced to writing). Instead, financial negotiations occurred after the fact on a backward-looking basis. See Email from Zetler to Marechaux dated October 23, 2013, Pl. Ex. 133 ("In Cape Town we spoke about correcting the past on a 60/40 split, I have heard nothing from you about this again. . . I propose taking $150k from cDs NY to start to reduce the $380k and the rest we must discuss"); March 2 Email ("I want to be compensated financially for extra time I know I put in compared to you last year).

Accordingly, the Court finds that Marechaux is not liable on Count V as he had no duty during the relevant time period to disclose the Project to counterclaim plaintiffs. Further, as counterclaim plaintiffs have failed to establish liability on Count V, the Court dismisses with prejudice Count VI against Treat and the Company for aiding and abetting fraud.[42]

## C. **Counts XII and XIII: CDS Online**

Zetler claims, derivatively on behalf of the Company, that if the Company owns Agencypad, then Marechaux, Racle, Riot, Viollon, and Treat, as fiduciaries of the Company, misappropriated a

---

[42] As the Court finds that the various defendants on Count V had no duty to disclose the software project, the Court does not reach the question of whether counterclaim plaintiffs have established the other elements of fraud by clear and convincing evidence.

83

business opportunity belonging to the Company by initiating and supporting the CDS Online Project (Count XII). See SAAC ¶¶ 311-315. Zetler further claims, on behalf of the Company, that if Marechaux is liable on Count XII for breaching his fiduciary duty, then Racle, Riot, Viollon, Treat, and SARL are further liable for aiding and abetting his breach (Count XIII). See id. ¶¶ 316-319.

Under Delaware law, "a corporate officer or director may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation." Broz v. Cellular Info. Sys., Inc., 673 A.2d 148, 154-55 (Del. 1996). The determination of "[w]hether or not a [fiduciary] has appropriated for himself something that in fairness should belong to the corporation is 'a factual question to be decided by reasonable inference from objective facts.'" Johnston v. Greene, 121 A.2d 919, 923 (Del. 1956) (quoting Guth, 5 A.2d at 513). "No one factor is dispositive and all factors must be taken into account insofar as they are applicable." Broz, 673 A.2d at 155.

Zetler points to three pieces of relevant evidence here: (1) the testimony of Joshua Lewis regarding similarities in the

appearance and functionality of the new software and Agencypad,
see Tr. 2000:18-22 (Lewis); (2) the size of SARL's investment in
the new software, see Def. Mem. at 23 (arguing that Marechaux would
not have invested €200,000 "in a product intended to serve only a
slice of the market"); and (3) the prominence of the online
software on a new website launched by Marechaux and Treat, see id.
(arguing that the website "relegated Agencypad to essentially a
footnote, where it occupies the same amount of space as is allotted
to the old, CDS6 software").

But with respect to whether the Company had an interest or
expectancy in the "opportunity," Zetler argues only that the
Company's business is precisely to develop and sell the same kind
of software. See Def. Mem. at 24. As regards sales of the new
software, all Zetler says is that "while this lawsuit has been
pending the Marechaux Parties have avoided creating evidence of
significant quantities of sales of their next-generation booking
application. Thus damages for disloyalty are impossible to
ascertain." Id. at 26. As a result, Zetler seeks an award of
attorneys' fees.

But Zetler's argument blurs the question of remedy with the
question of breach. The Company and SARL have always been in the
same general business. Indeed, for most of its existence, the
Company sold software owned by SARL. The difference between the
Company and SARL is that the Company sells to the North American

market and SARL sells to the European market. Thus, the relevant opportunity is software sales, not software development (which is expensive and generates no income). In so far as Zetler is arguing that assisting in SARL's development of new booking software constitutes breach, his breach claim fails because the Company has no interest or expectancy in developing new booking software. The Company already owns online booking software, Agencypad, which was enormously successful. See Tr. 1371:14-15 (Treat) (testifying that the Company had an 85% U.S. market share).[43]

As regards the Company's interest in selling booking software to its clients and to customers in the Americas, although Zetler points to some evidence of the Company's efforts to market the new software, see Email from Riot to Treat dated July 8, 2016, Def. Ex. 279 (regarding a meeting to demo the new software for a European client); Email from Treat to Marechaux dated July 28, 2016, Def. Ex. 285 (regarding a European client); Email from Treat

---

[43] Additionally, as regards Racle, Viollon, Riot, and Treat, counterclaim plaintiffs fail to establish that the Company was financially able to exploit the Project while they were fiduciaries of the Company. The only evidence relied on by counterclaims plaintiffs is Treat's testimony that the Company "was doing well by 2015." See Def. Mem. at 24. While the Court notes the continued strong sales of Agencypad in 2016, counterclaim plaintiffs point to no income statements or other evidence cataloging the Company's expenses during this time period. Given the modest size of Agencypad revenues, it is likely that the costs of this litigation threatened to bankrupt the Company and that the Company could not have afforded to invest hundreds of thousands of dollars in software development.

to Marechaux dated July 28, 2016, Def. Ex. 286 (same), he does not argue that this evidence establishes that SARL or the fiduciaries sold the new software to the Company's clients. Nor does not Zetler contest the fiduciaries' claim that the new software remains unfinished. Thus, the Court declines to speculate what SARL is going to do with the product once it is completed and whether SARL will allow the Company to sell the product in North America without paying a commission to SARL in much the same way that SARL allowed the Company to sell other products in North America over the past two decades. Accordingly, the Court finds Marechaux, Racle, Riot, Viollon, and Treat not liable on Count XII and Racle, Riot, Viollon, Treat, and SARL not liable on Count XIII.

### D. **Counts VIII and IX: CDS6**

Zetler claims derivatively on behalf of the Company that Marechaux, Racle, Riot, Viollon, and Treat wasted the Company's assets because, if the Company owns Agencypad, then the Company must also own CDS6 (because Gugnishev wrote both applications), and the above-mentioned individuals allowed SARL to keep all of the proceeds from sales of CDS6 in Europe (Count VIII). See Def. Mem. at 26. Furthermore, Zetler asserts an unjust enrichment claim against SARL for retaining the proceeds of its sales of CDS6 without compensating the Company (Count IX).

Under Delaware law, fiduciaries breach their duty to a company when they waste its assets. "Roughly, a waste entails an exchange

of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade. Most often the claim is associated with a transfer of corporate assets that serves no corporate purpose; or for which no consideration at all is received." Brehm v. Eisner, 746 A.2d 244, 263 (Del. 2000). However, where "any substantial consideration [is] received by the corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude ex post that the transaction" was unreasonably. Id. Moreover, Delaware's view is that courts "are ill-fitted to attempt to weigh the 'adequacy' of consideration under the waste standard or, ex post, to judge appropriate degrees of business risk." Id.

Here, the corporate asset – CDS6 – was developed between 2005 and 2009 as an upgrade for CDS5, which itself was an upgrade of M5, products owned by SARL. Gugnishev was the primary software developer on the CDS6 upgrade; and Zetler was president of the Company at the time. Both the Company and Zetler agreed SARL would own CDS6, despite Gugnishev's role in developing it. As part of that agreement, the Company accepted over $100,000 from SARL for Gugnishev's development work and SARL did not charge the Company for commissions on sales of CDS6 in the United States (as it had not charged the Company for commissions on sales of prior

iterations of the CDS booking software). See Email dated October 6, 2005 from Marechaux to Zetler, Pl. Ex. 108 ("cDs NY will charge Monthly cDs Paris for Software Development 3 500 USD Starting date 01 January 2006"); Invoice Dated January 12, 2006, Pl. Ex. 43 (billing SARL $43,200 for "Generation 5 software edition 2006"); Statement dated February 17, 2009, Pl. Ex. 52 (showing invoices to SARL for $43,200 for the years 2006-2008). SARL's ownership of CDS6 is also reflected in the end-user license agreement for the software, see Tr. 303 (Horowitz), and prior to this lawsuit, no party in this case had ever asserted that the Company owned CDS6.

Zetler contends, nonetheless, that it would be inequitable if SARL owned the CDS6 upgrade but the Company owned Agencypad, as Gugnishev was employed by the Company when he made his contributions to both applications. But Zetler essentially admits that it was his understanding that Gugnishev had been "farmed out" to SARL for purposes of creating CDS6, see Tr. 1900 (Zetler), and there is no evidence (aside from Zetler's testimony at trial) that anyone, even Zetler at the time, thought that Gugnishev had been farmed out to Rapid Systems for purposes of developing Agencypad. Accordingly, Zetler cannot now claim on behalf of the Company that the fiduciaries are liable for ceding ownership of CDS6 to SARL when Zetler himself is the one who agreed that Gugnishev would work on CDS6 for SARL.

The Court further finds that the fiduciaries have not breached their duties to the Company by failing to "assert rights over CDS6 software," SAAC at 38, in the period beginning on March 4, 2016 when Zetler was terminated as president and when Racle, Riot, Viollon, and Treat became fiduciaries of the Company for the first time. Among other things, were the Company to have claimed ownership of CDS6 after March 4, 2016, SARL would have had many definitive defenses including waiver, ratification, laches, and assignment. Moreover, the Company continues to receive benefits from SARL. Accordingly, the Court finds Marechaux, Racle, Riot, Viollon, and Treat not liable on Count VIII.

Turning to SARL's liability on Count IX, which defendants do not address in their briefing, the Court finds that Zetler has failed to show that the Company suffered a detriment in the absence of justification. See Sharp v. Kosmalski, 40 N.Y.2d 119, 123 (1976) ("[a] person may be deemed to be unjustly enriched if he (or she) has received a benefit, the retention of which would be unjust"). "A conclusion that one has been unjustly enriched is essentially a legal inference drawn from the circumstances surrounding the transfer of property and the relationship of the parties. It is a conclusion reached through the application of principles of equity." Id.

The Company, under Zetler's leadership, agreed to have Gugnishev work on behalf of SARL to update SARL's booking software.

In exchange, the Company received financial compensation and the right to sell the product in North America without commissions. Over a decade later, after acquiescing in SARL's ownership of the software and accepting benefits on behalf of the Company in exchange for Gugnishev's contributions to coding the product, Zetler cannot now claim on behalf of the Company that SARL has been unjustly enriched. Additionally, even if the Company currently held the copyright in CDS6, which it does not, Zetler has failed to establish an "absence of justification" for SARL's failure to pay commissions on its sales of the software. Among other things, the Company is not positioned to exploit the European market and the Company receives from SARL various valuable services free of charge. See, e.g., Tr. 969 (Viollon) (testifying that he did the billing, collection, accounting, and took care of some administrative processes for the Company); Tr. 1175 (Riot) (testifying that she ran, at various times, sales and development for the Company). Accordingly, the Court finds SARL not liable on Count IX.

### E. **Counts X and XI: Agencypad**

Zetler claims in the alternative and derivatively on behalf of the Company that Marechaux, Racle, Riot, Viollon, and Treat wasted the Company's assets because, if CDS Inc. owns Agencypad, it is CDS Inc.'s asset, and the above-mentioned individuals allowed

91

SARL to keep all the proceeds from the (albeit limited) sales of Agencypad in Europe. See SAAC ¶¶ 300-305.

But when Zetler ran the Company, he never tried to collect commissions on sales of Agencypad in Europe, even though, at the very least, he knew that everyone else at the Company and at SARL thought that the Company owned Agencypad. See Tr. 1699 (Zetler) (testifying that "we broke each office up into being responsible for certain geographical regions"). Now, of course, Zetler claims that Rapid Systems owns Agencypad, but, when he was president, Zetler did not try to collect commissions for Rapid Systems on sales of Agencypad in Europe either. This, the Court finds, is because Zetler understood that the companies had an unwritten agreement that Rapid Systems was permitted to sell CDS5, CDS6, and Agencypad in South Africa, New Zealand, and Australia without paying a commission to SARL or the Company, see id. (testifying that "any sales in Australia, New Zealand eventually ended up under a Rapid Systems contract"); the Company was permitted to sell all those products in North America without paying a commission to SARL, see id. (testifying that "if there's any contract to be signed in North and South America, it would be signed by CDS, Inc."); and SARL was permitted to sell all those products in Europe without paying a commission to the Company, see id. ("CDS Paris would sell in Europe, eastern Europe and Asia").

If it was not corporate waste when Zetler declined to charge SARL a commission for Agencypad, either from the Company or from Rapid Systems, then it cannot be corporate waste now that the Company's Board has terminated him from his role as president. Moreover, the Court finds that the Company allows SARL to sell Agencypad in Europe without paying a commission as part of a larger agreement which plainly redounds to the Company's benefit. See Part III (D), infra (cataloging various free services provided by SARL to the Company). Accordingly, Zetler also fails to establish a prima facie case of waste. Therefore, the Court finds Marechaux, Racle, Riot, Viollon, and Treat not liable on Count X.

For the same reasons, the Court further finds SARL not liable on Count XI (unjust enrichment). SAAC ¶¶ 306-310. SARL secured the right to sell Agencypad in Europe without paying a commission in exchange for valuable consideration pursuant to oral agreements between all the relevant parties prior to this lawsuit, including the right to sell CDS6 in North and South America.

### F. Count XIV: Bad Faith

Zetler claims that Riot, Viollon, Racle, and Treat breached their duty of good faith to the Company, consciously disregarding their responsibility to the Company by deliberately promoting SARL's interests at the expense of the Company's interests. See SAAC ¶¶ 320-322. By its plain terms, this claim relates only to the fiduciaries' alleged failure "to take any steps to remedy

93

Marechaux's wrongful development of an online software application intended to compete with Agencypad." Id. ¶ 322. Thus this claim is duplicative of Counts XII and XIII and fails for the same reasons discussed in Part III (C) (among other things, Zetler has failed to show harm to the Company, he only hypothesizes potential harm). Accordingly, the Court finds Riot, Viollon, Racle, and Treat not liable on Count XIV.

## IV. **EQUITABLE RELIEF**

Based on the foregoing findings and conclusions, as well as the entire record in this case, the Court imposes the following equitable relief:

In connection with Counts I, II, VIII, and IX of plaintiff's complaint, defendants are hereby ORDERED to transfer to plaintiff, by no later than 5:00 P.M. on April 4, 2018, the following: all copies of the AGENCYPAD SOURCE CODE; all copyrights in said source code including TXu-1-987-358 for the Agencypad Frontend Code, TXu-1-989-523 for the Agencypad Frontend Code 2016, TXu-1-987-384 for the Agencypad Backend Code, TXu-1-989-524 for the Agencypad Backend Code 2016; and all trademarks in Agencypad including No. 86956066 dated March 29, 2016 (Pl. Ex. 9). Defendants are further ORDERED to cancel by 5:00 P.M. on April 4, 2018 copyright registrations TXu-1-987-927 for the Portfoliopad, Castingpad, and Agencypad Database and Txu-1-987-318 for the Portfoliopad and Agencypad Stored Procedures and Database Schema, which

registrations, in part, improperly copyright code and data belonging solely to plaintiff or plaintiff's clients.

In connection with Counts III and VI, defendants are hereby ORDERED to provide plaintiff by no later than 5:00 P.M. on April 2, 2018, all passwords and access codes to the AMAZON WEB SERVICES ACCOUNT as well as the lease and other related administrative information. [44] Defendants are further ORDERED to submit to Magistrate Judge Cott (see infra) and to plaintiff, by no later than 5:00 P.M. on April 4, 2018, a list of all content on the account to which defendants claim they are entitled, at which point plaintiff will have until 5:00 P.M. on April 9, 2018 to file with Magistrate Judge Cott any objections. Absent any objections from plaintiff, or after the Magistrate Judge has resolved any such objections (which it is requested be done by no later than April 16, 2018), defendants are ORDERED to remove this content from the

---

[44] By letter to the Court dated March 14, 2018, defendants dispute that there is such a thing as the "Amazon Account." According to defendants, there "is a contract with AWS for the use of some of AWS's servers." These servers, of course, are accessed via an account provided by Amazon pursuant to the contract. That contract, as well as related log-in information, properly belongs to plaintiff, as it was paid for by plaintiff on the understanding that Zetler had set it up on behalf of plaintiff. Although Zetler continues to maintain that he entered into this contract on behalf of Rapid Systems, he points to no evidence that he disclosed this to his colleagues at the Company or secured permission from them to do so. As discussed previously, since Zetler paid the bills for these services with the Company's funds and put the Company's assets on the account he cannot now claim that it is Rapid Systems' or the LLC's account.

account at their own expense and by no later than April 30, 2018, without interfering in any way with plaintiff's property. (Where plaintiff and defendants are both entitled to certain content, defendants will remove a copy of that content.)[45] However, prior

[45] Defendants argue that pursuant to 28 U.S.C. § 2202, after the Court has determined the parties' rights by a declaratory judgment, they are entitled to reasonable notice and a hearing before the Court issues permanent injunctive relief. See Letter dated March 14, 2018. The Court finds, however, that there is no such requirement in these circumstances. Among other things, plaintiff sought the instant injunctive relief in its initial complaint. See Compl. ¶ 96 (requesting the Court order defendants to provide the Company with passwords and access codes to the Account); id. ¶ 125 (requesting the Court order Zetler to provide the Company with "all the necessary access codes, passwords, and administrative access rights to all of [the Company's] accounts as set forth above and to permanently enjoin him from exercising any administrative rights as set forth above"). Accordingly, defendants have been on notice for nearly two years. Additionally, the Court held a hearing prior to issuing a preliminary injunction regarding the Amazon Account, and, thereafter, a three-week trial on the merits. Moreover, plaintiff is entitled to this injunctive relief in conjunction with Count VI, which does not arise under the Declaratory Judgment Act. Further still, even after the trial, the Court heard argument on this issue, see Transcript dated March 27, 2018, and permitted defendants to submit two letter briefs with accompanying factual allegations. In substance, defendants request permission to leave their information on the Amazon Account and instead remove plaintiff's information. According to defendants, this would be "the most efficient way" to disentangle their property from plaintiff's property. But the costliness to defendants of recognizing plaintiff's rights is of minimal importance under the circumstances. The server space, which was paid for by plaintiff prior to this lawsuit, belongs to plaintiff. It must therefore be promptly returned to plaintiff, although without prejudice to plaintiff negotiating an alternative, "more efficient" arrangement with defendants. As regards defendants' concerns about plaintiff interfering with their information, by and through this Order, the Court hereby prohibits plaintiff from accessing or altering defendants' information on the Amazon account, including data uploaded by Portfoliopad's users, or from interfering with defendants' ability to access that information

to April 30, 2018, plaintiff is ORDERED to permit defendants to access the Amazon Account for the limited purposes of (1) operating their business and, following the Magistrate Judge's approval of defendants' list, (2) removing their content. Thereafter, plaintiff is to inform Magistrate Judge Cott within two weeks if plaintiff believes any content has been improperly removed and, within six weeks, defendants are ORDERED to submit a bill evidencing the daily cost of hosting defendants' removed information with Amazon; to estimate the cost to plaintiff of hosting this information beginning on April 1, 2018; and to reimburse plaintiff for that amount forthwith.

In connection with Counts IV, VI, and IX, defendants are hereby ORDERED to immediately turn over all passwords and access codes to the RACKSPACE ACCOUNT containing the CDSGLOBAL.COM email accounts as well as the lease and other related administrative information. Defendants are further ORDERED to remove, by no later than April 16, 2018, all other information from the account at

---

for the limited purposes discussed herein. Unless and until the parties show otherwise, the Court views clients as the proper owners of the data they upload. Therefore, as long as clients remain under contract with defendants, their data remains properly under the control of defendants. However, if, in the coming weeks, defendants' clients decide to terminate their contracts with defendants and switch to C.D.S. Inc.'s alternative imaging software, then defendants shall not be permitted to remove those clients' data from the Amazon account. (Similarly, over the past few weeks, the Court has permitted defendants to remove data belonging to Agencypad clients from the server where clients have opted to switch to defendants' alternative booking software.)

their own expense, without interfering in any way with plaintiff's property. Plaintiff is ORDERED to permit defendants to access the account for the limited purposes of (1) operating their business until April 16, 2018, and (2) removing their content.

In connection with Count IX, defendants are hereby ORDERED to transfer to plaintiff all passwords, access codes, and administrative rights to the SOCIAL MEDIA ACCOUNTS at Facebook, Twitter, and Instagram by no later than April 3, 2018.

In connection with Counts VI and IX, defendants are hereby ORDERED to transfer to plaintiff the domain registrations for CDSGLOBAL.COM, CREATIVEFILE.COM, and AGENCYPAD.COM as well as any access codes, passwords, and administrative rights in and to those domain names by no later than 5:00 P.M. on April 2, 2018.

In connection with Count IX, defendants are hereby ORDERED to turn over a duplicate copy of any DEVELOPMENT TOOLS used by Agencypad or containing Agencypad information, to the extent not already done so in connection with the preliminary injunction, and to remove from their copy of those tools any Agencypad information by no later than 5:00 P.M. on April 4, 2018.

In connection with Count IX, defendants are hereby ORDERED to turn over all BUSINESS RECORDS belonging to the Company in defendants' possession by no later than April 16, 2018, including the Company's tax information and accounts with the City and State of New York and the United States Internal Revenue Service; all

information regarding the Company's health insurance plans and accounts; all information regarding the Company's furniture supplier; all information regarding the Company's representation in a lawsuit with a modeling agency that was pending in 2016; and all information regarding the suppliers, including their contact details, that Zetler paid on the Company's credit card or from the Company's Citibank account. In so far as the Amazon and Rackspace servers contain information that relates to the Agencypad software product or that belongs to any persons who are clients of the Company pursuant to contracts with the Company, defendants are ORDERED to leave that information on the servers and to delete any copies of that information otherwise in their possession.

In connection with Count VIII, defendants shall be, and hereby are, permanently ENJOINED from selling the software product Agencypad or from using information from the Company's contracts regarding Agencypad to sell other booking software. Defendants are further ORDERED to permanently delete all copies of the Agencypad source code in their possession within one week of plaintiff's notifying the Magistrate Judge that all of the relevant data required for Agencypad to operate is on the Amazon server.

## V. **FINAL JUDGMENT**

For the reasons stated above, the Court hereby enters FINAL JUDGMENT awarding judgment in favor of plaintiff against Rapid Systems on Count I, against CDS LLC on Count II, and against

Bradley Zetler on Counts III and IV; dismissing Count V; awarding judgment in favor of plaintiff against Bradley Zetler on Counts VI and VII, to the extent previously described; awarding judgment in favor of plaintiff against Zetler and CDS LLC on Counts VIII and IX, to the extent previously described; and dismissing Counts X and XI. In connection with Counts I, II, III, IV, VI, VIII, and IX the Court awards equitable relief as detailed in Part IV, supra. In connection with Count VII the Court awards damages to plaintiff and against Bradley Zetler in the amount of \$47,277.44. Finally, the Court dismisses with prejudice all of defendants' counterclaims.

All future disputes among the parties of any kind whatsoever are referred in the first instance to Magistrate Judge James Cott; and while his determinations may be appealed to the extent permitted by law, his rulings will take effect immediately upon issuance.

The Clerk of Court is hereby instructed to close docket entry numbers 396, 397, and 399.

SO ORDERED.

Dated:    New York, NY
          March 31, 2018

JED S. RAKOFF, U.S.D.J.

100